ORIGINAL

Timothy H. Power
19229 Sonoma Highway
Sonoma, CA 95476
Telephone: 925-323-7062
Fax: 925-975-0333

FILED
FEB 26 2007
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ALIAMANU CONSERVATION PARTNERS, INC. | ) | 07-134-C |
| Plaintiff | ) | |
| vs. | ) | Civil Action No. |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant | ) | |

COMPLAINT

Plaintiff, Aliamanu Conservation Partners, Inc (hereinafter "ACP") as and for its Claim for Relief against Defendant, the United States, alleges as follows:

1. This action is an appeal from a Contracting Officer's Final Decision issued on October 31, 2006, styled a Termination Settlement Determination, rejecting ACP's settlement proposal and making a unilateral determination that Plaintiff owed the government for an overpayment of $6,215,003.

2. This Court has jurisdiction over this matter under the Contract Disputes Act, 41 U.S.C. §609(a).

3. On February 11, 1991 the United States Army Engineers, Huntsville, Alabama awarded Contract No. DACA87-91-C-0019 (the Contract) to Co-Energy Group

(CEG). Shortly after award the contract was transferred to the United States Army Corps of Engineers, Honolulu Engineer District, for administration and payment.

4. On September 3, 1992 the Contract was novated from CEG to Cegali, Inc (Gegali). Cegali is a Nevada Corporation wholly owned by CEG.

5. On March 23, 1995 the Contract was novated from Cegali to Aliamanu Conservation Partners L.P (ACP), a limited partnership established in Hawaii with Cegali as the General Partner.

6. Because CEG, Cegali, and ACP all were the contracting party at different times, and performed work on the contract at different times, the term "Plaintiff" shall mean whichever entity was the contracting party in privity of contract with the government at the time of the facts alleged.

7. The Contract is a Shared Energy Savings (SES) contract to implement energy and maintenance savings at the Aliamanu Military Reservation (AMR) family housing complex on Oahu, Hawaii.

8. Congress authorized SES contracts in Title VIII of Public Law 99-72, U.S.C. §8287 et seq., (hereinafter "Title VIII"). Title VIII authorizes the government to enter into contracts with terms as long as 25 years for the purpose of reducing the cost of energy consumed at government facilities. Title VIII entitled "Shared Energy Savings," was enacted in 1986 as an amendment to the National Energy Conservation Policy Act.

9. Shared Energy Savings contracts contain unique provisions. They differ from most Federal contracts in several respects:

a. The purpose of an SES contract is to reduce energy consumption and energy and maintenance costs at government facilities over a period of time.

b. An offeror on an SES contract includes Energy Conservation Proposals (ECPs) it plans to install and a prediction of how much energy the ECPs will save over the current energy use. The specifications of the contract do not specify what ECPs to install nor what energy savings are to be achieved.

c. All energy savings equipment installed is paid for by the contractor. This includes paying all interest on any loans used to finance the purchase of the equipment and the cost of installation.

d. The contractor repairs or replaces any equipment installed as an ECP for the term of the contract.

e. The contract is a combination of a construction contract and a services contract. The contract has an initial construction phase during which ECPs are installed. The construction phase is followed by the service phase where the contractor performs preventive maintenance and service calls as well as repair and replacement of the energy savings equipment.

f. Payment to the contractor is not based upon cost to the contractor nor is there a stated contract price at the time of award. Upon completion of the construction phase the contractor is entitled to payment based upon a portion of the energy and maintenance costs avoided by the government over the term of the contract.

g. There is an energy baseline based on historical government energy use that is compared to energy use after the ECPs are completed to determine energy savings for each month of the contract's term.

10. Because the Contract involves both construction and service phases the applicability of the special contract requirements in Section H of the Contract are annotated after each clause as either Services or Construction or both.

11. Clause H.29 provides two Termination for Convenience clauses depending upon whether the termination occurs during the construction phase or services phase

12. Clause 52.249-0002, ALT 1 (APR 1984) applies during the construction phase and Clause 52.249-0002 (APR1984) applies to the service phase. The Contract uses Standard Army Automated Contracting Systems (SAACONS) to number clauses in the Contract. SAACONS clause 52.249-0002 is FAR clause 52.249-2.

13. Federal Acquisition Regulations (FAR) require clause 52.249-2 ALT 1 be used in construction contracts. Clause 52.249-2 is required in service contracts. The difference between SAACONS 52.249-0002 (APR 1984) and 52.249-0002 ALT 1 (APR 1984) is in paragraph (f).

14. The current version of FAR 52.249-2 was adopted in 1996. It is now 52.249-2 (SEP 1996). The newer edition of FAR contains subparagraph (g) for subparagraph (f) because a new subparagraph was added before subparagraph (f) in the 1996 edition of FAR. FAR 52.249-2(f) (APR1984) and 52.249-2(g) (SEP1996) are the same. The clause applicable to this Contract is the 1984 clause

15. Clause 52.249-0002(f) ALT 1 states:

> (f) If the Contractor and Contracting Officer fail to agree on the whole amount to be paid the Contractor because of the

termination of work, the Contracting Officer shall pay the Contractor the amounts determined as follows, but without duplication of any amounts agreed upon under paragraph (f) of this clause:

(1) For contract work performed before the effective date of termination, the total (without duplication of any items) of –

(i) The cost of this work . . .

16. Clause 52.249-0002(f) states:

(f) If the Contractor and the Contracting Officer fail to agree on the whole amount to be paid because of the termination of work, the Contracting Officer shall pay the Contractor the amounts determined by the Contracting Officer as follows, but without duplication of any amounts agreed on under paragraph (f) of this clause:
(1) The contract price for completed supplies or services accepted by the Government (or sold or acquired under subparagraph (b) (9) of this clause) not previously paid for . . .

17. The Contract stated that the purpose of the contract was to "engage a contractor who will provide equipment and services at Alimanu Military Reservation (AMR) family housing complex, Honolulu, Hawaii that shall result in a reduction in the energy expenditure." The AMR family housing complex contained 1510 townhouse units and 1090 apartment units at the time of award.

18. The terms of the Contract require an offeror to propose installation of Energy Conserving Projects (ECPs), estimate the energy savings from the ECPs, and maintain the ECPs for the term of the contract. At the expiration of the Contract term all equipment installed by the contractor became the property of the Government.

19. The Contract required, as a minimum, the replacement of existing air conditioning and cooling equipment in the family housing units. The contractor could propose additional ECPs to reduce further energy expenditures and maintenance savings at

AMR. Plaintiff proposed 12 additional ECPs in its best and final offer such as replacing existing lighting with more efficient lighting fixtures and lamps.

20. The services and equipment used to reduce energy consumption and maintenance expenditures were provided by the contractor at its own expense. In return for this expenditure, the government promised to pay the contractor a portion of the government's avoided energy and maintenance expenditures for the term of the contract.

21. Payment to the contractor for its portion of the energy and maintenance savings began after construction of all ECPs and acceptance by the contracting officer.

22. The total contract term was 15 years. After completion and acceptance of the ECPs, monthly payments were calculated each month for the remaining term of the contract.

23. There are two parts of the calculation of Energy savings; the amount of electricity saved and the cost of the electricity.

24. The cost of Kwh and KW used in the formula was established upon award of the Contract. It is the cost of electricity at the time of award adjusted overtime by the Consumer Price Index for Honolulu, Hawaii.

25. The amount of energy saved each month was determined by the difference between a baseline electricity consumption for historical use at AMR (measured in Kwh and KW) prior to the award of the contract and energy use after completion of the ECPs.

26. This difference in energy use for the month was then multiplied by the cost of

Kwh and KW established by the contract. The product was the dollar value of that month's Energy Savings.

27. Because the amount of energy use savings was different each month, the amount calculated for Energy and Maintenance Savings varied each month.

28. The value of government avoided maintenance costs was based upon the government's anticipated cost of the repair and replacement of existing equipment during the 15 year term of the contract. This included the approximately $6,000,000 cost of a new substation for AMR. The substation was required because of an increase in energy use at AMR. Because the Contract significantly reduced the energy consumption at AMR the substation was not required and the government avoided the cost of the substation.

29. The authorizing legislation and the terms of the Contract, maintenance savings could not be more than energy savings. To comply with this limitation the amount of monthly Maintenance savings was set as one dollar ($1.00) less than the Energy savings payable to the contractor. Monthly Maintenance savings were based upon monthly energy savings less one dollar even if avoided maintenance costs to the government were greater than this.

30. Problems relating to the calculation of energy use started after completion of the ECPs. Between 1993 and 1996 there were several discussions between the Plaintiff and the government about the correct amount of electric use savings.

31. There were several variables that affected accurately measuring energy consumption at AMR.

    a. There was only a single meter measuring the energy used for all the

facilities at AMR. It was difficult to accurately calculate energy consumption only for the housing covered by the contract.

b. The government added energy consuming equipment after the baseline was established.

c. The tenants used more energy than in the baseline period through increased use of computers, televisions, portable heaters, refrigerators, removing ECPs such as energy savings light bulbs and replacing them with regular high wattage bulbs, and changing special temperature controlling thermostats.

d. More units were occupied during contract performance than during the period included in the baseline.

32. The parties made several modifications to the Contract for calculation of energy savings but none of the implemented changes solved the problem of accurately measuring energy savings caused by changes after the baseline was established.

33. Some of the changes of energy use after establishment of the baseline resulted from the failure of the government to carry out its contractual responsibility to notify plaintiff of any changes in energy consuming equipment and to control tenant interference with the ECPs.

34. In 1996 the parties negotiated an amount for monthly energy savings to use over the remaining term of the Contract which assured plaintiff that the contract would be profitable at the expiration of the Contract.

35. Modification P00100, effective June 1, 1996 implemented these negotiations with

a monthly savings of 2.0 million Kwh and 4,500 KW. Monthly Maintenance savings remained as one dollar ($1.00) less than energy savings for each month.

36. After Modification P00100 both the cost of energy and the energy savings were established as constant numbers. Thereafter the monthly payment to Plaintiff for its share of cost of energy and maintenance savings was the same every month except for adjustment for the CPI to energy costs.

37. This was the formula used from June 1, 1996 until the Contract was terminated for the convenience of the government.

38. On August 12, 2004 the contracting officer notified the plaintiff that the Contract was being terminated for the convenience of the government with an effective termination date of September 30, 2004. The remaining term of the Contract was 16.3 months beyond the effective date of termination.

39. The services termination for convenience clause applicable after completion of the ECPs (52.249-0002(f)(1)) requires that the government pay the contract price for completed supplies or services accepted by the Government. and not previously paid for.

40. The construction of all the ECPs and acceptance by the government occurred in 1993. At this time the consideration provided and promised by the government in return for the construction of the ECP was a share of the energy and maintenance savings achieved over the term of the Contract. These future payments for savings are the equivalent to the contract price for purposes of an SES contract.

41. Under clause 52.249-0002(f)(1) upon termination the government owed Plaintiff the contract price for the completed ECPs less payment already made for energy

and maintenance savings. This amount is the energy and maintenance savings payable from the effective date of termination when the last monthly payment for energy savings was made by the government until the expiration of the original term of the contract.

42. The parties had an initial meeting concerning the Plaintiff's submittal of a termination settlement proposal. Plaintiff's position was that the government owed a lump sum equal to the remaining monthly payments until expiration of the original term of the contract.

43. The Government representatives rejected the Plaintiff' position and required that the settlement proposal be based upon the total costs incurred from the date of contract award until the effective date of termination, a period of over 13 years.

44. Although Plaintiff disagreed that a total cost approach was proper as directed plaintiff on June 20, 2005 submitted a settlement proposal of $9,764,061 based upon costs incurred during performance,

45. The Contracting Officer required submission of cost and pricing data to support the settlement proposal. He asserted that cost and pricing data was required by FAR Part 15 which covers negotiated acquisitions. The Contracting Officer demanded that the Plaintiff submit all cost records for the period of performance, a period of over 13 years.

46. The Plaintiff disputed the requirement that cost and pricing data be submitted to support a settlement proposal. The Plaintiff asserted that locating cost records relating to equipment purchased and installed over 13 years before the termination would be very difficult and time consuming, was unreasonable, and might be

impossible.

47. The Plaintiff and the government exchanged legal positions on the need to submit cost and pricing data in support of a termination settlement proposal.

48. Discussions on cost failed to resolve the difference in interpretation about the requirement for cost and pricing data.

49. On October 31, 2005 Plaintiff submitted a revised settlement proposal of $7,641,722. The revised proposal was primarily based on the contract price unpaid for completed and accepted ECPs during the construction phase. This was computed as the total of Energy and Maintenance savings for the 16.3 months of the original term of the Contract remaining after the effective date of termination.

50. The proposal also requested an amount for unamortized asset value of $1,329,807 for the early termination of the contract

51. The October 31, 2005 proposal was the final settlement proposal submitted to the Contracting Officer. The contracting officer's final decision denied the October 31, 2005 settlement proposal.

52. The contracting officer persisted in requesting cost and pricing data despite the fact that the second settlement agreement proposal was based on the contract price for completed work and not cost.

53. The contracting officer traveled to Las Vegas, Nevada, where the Plaintiff stored records relating to costs incurred in performance of the Contract.

54. The contracting officer examined the Plaintiff's cost records and copied those documents he wanted.

55. The DCAA Audit Report on the Plaintiff's October 31, 2005 termination

settlement proposal was submitted to the contracting officer on August 23, 2006. The DCAA's audit report questioned $62,861 of claimed termination settlement costs and allowed $272,216. DCAA did not question any of the Plaintiff's claimed settlement expenses of $186,331.

56. The parties discussed settlement on October 3, 2006. The contracting officer based his settlement position on subtracting the costs he identified plus profit from the total government payments on the Contract. This resulted in an alleged overpayment to the Plaintiff.

57. The Contracting Officer issued a unilateral Contracting Officers Final Decision on October 31, 2006. That decision made the following determinations:

   a. That total costs incurred by the plaintiff from contract award until termination and profit on those costs was $40,847,881;
   b. That nothing was owed on the request for unamortized asset value;
   c. That $132,994 was due for settlement expenses;
   d. That $256,534 was due for termination expenses;
   e. That the total amount due for the settlement was $41,237,389;
   f. That the government paid the plaintiff $46,379,724 during performance of the Contract;
   g. That partial termination payments of $1,072,668 were made after the termination;
   h. That the difference between the amount due under the settlement and the amount paid by the government was an overpayment to Plaintiff of $6,215,003.

58. the Contracting Officer rejected the Plaintiff's proposed payment of the Energy and Maintenance savings until the original expiration date of the Contract on the basis that FAR 52.249-2(f)(2) states that the government only will pay costs incurred in the performance of the work terminated that have not previously been paid.

59. The contracting officer denied Plaintiff's request for $1,329,807 for unamortized asset value for the early termination of the contract.

60. The Plaintiff's proposed settlement payment of the energy and maintenance savings until the original expiration date of the contract is based upon FAR 52.249-2(f)(1) which states that the government will pay the contract price for completed work that has not previously been paid.

61. The contract price for the installation and implementation of the ECPs is the amount of monthly energy and maintenance savings from the date of completion and acceptance of the ECPs until the expiration date of the contract. This amount is based upon the amount of energy and maintenance costs avoided by the government during the term of the contract and has no relationship to the costs incurred by the Plaintiff.

62. The monthly payment for energy and maintenance savings at the date of termination set by the contract was $338,600.

63. At the effective date of termination there were 16.3 months remaining until the original expiration date of the Contract. The unpaid contract price, based upon the monthly savings for the remainder of the original term of the Contract, for the completed installation and implementation of the ECPs was $5,519,180.

64. The Contracting Officer's determination not to pay Plaintiff for completed work under FAR 52.249-2(f) (1) but instead pay only for costs incurred under FAR 52.249-2(f)(2) was a failure to apply the mandated regulation and violated the applicable termination for convenience regulations in FAR Part 49.

65. The Contracting Officer's failure to allow the amounts found proper by the DCAA audit report for termination and settlement expenses was an abuse of discretion, arbitrary and capricious, and was unreasonable. This failure also violated the cost principles and guidance in FAR for allowable, allocable, and reasonable costs concerning terminations for convenience.

WHEREFORE, PLAINTIFF PRAYS JUDGEMENT AS FOLLOWS:

A. The amount of $5,519,180 as the contract price for completed work;

B. The amount of $1,329,807 for unamortized asset value for the early termination of the contract;

C. That the government be allowed a credit for any partial termination payments it made after termination;

D. For termination expenses of $272,216 determined by the DCAA audit report to be allocable, allowable and reasonable;

E. For settlement expenses of $186,331 determined by the DCAA audit report to be allocable, allowable and reasonable;

F. For interest on the amount found due to Plaintiff as allowed by Statute or regulation;

G. That it be determined that the Plaintiff was not overpaid and owes nothing to the government;

H. For other relief as this court finds authorized, allowable, and just.

Dated: February 23, 2007

Timothy H. Power
Attorney for Plaintiff
Telephone: (925) 323-7062
Fax: (925) 975-0333