FINAL DECISION OF THE CONTRACTING OFFICER

Contract No. DACA87-91-C-0019
Shared Energy Savings Program
Aliamanu Family Housing Area, Oahu, Hawaii

TERMINATION SETTLEMENT DETERMINATION

INTRODUCTION

1) By Modification Number P00212 dated 12 August 2004 the Contractor was notified that, effective 30 September 2004, the contract was being terminated for the convenience of the Government and the Contractor was requested to provide its termination settlement proposal within one year from the effective date of the termination. The Contractor subsequently submitted a proposal and negotiations were conducted; however, the parties were unable to negotiate a bilateral termination settlement amount. During the settlement negotiations, the Contractor orally requested that the undersigned, as the Termination Contracting officer (TCO), issue a Contracting Officer's Final Decision (COFD) regarding the termination settlement amount. This COFD contains my determination of the appropriate termination settlement amount, and sets forth the basis for my unilateral determination.

2) Among other things, the Contractor contends that it is entitled to all of the payments that it already received under the contract, plus its termination expenses and settlement costs, as well as all of the remaining fixed payments that the Contractor would have received had the contract not been terminated for the convenience of the Government. The Government contends that the Contractor is not entitled to the fixed monthly payments the Contractor would have received had the contract not been terminated; and that the final contract price resulting from the termination should be based upon the Contractor's actual cost incurred prior to the effective date of the termination, as well as the Contractor's allowable, allocable, and reasonable termination and settlement cost incurred after the contract was terminated.

3) In order to arrive at my final decision, I reviewed pertinent provisions and clauses of the contract; several items of correspondence between the Contractor and the Honolulu Engineer District (HED), including the Contractor's proposal; the Defense Contract Audit Agency (DCAA) audit report concerning the Contractor's purported termination settlement proposal, various documents obtained from the Contractor during my personal review of the Contractor's records in Nevada; and various other Government-generated internal documents. Based upon my review, I have determined that as a result of the termination for the convenience of the Government, the final contract price should be definitized at $41,237,389; and since the Contractor has already received payments under the contract totaling $47,452,392, the Contractor needs to repay the Government the excess payment amount of $6,215,003, plus interest. Federal Acquistion Regulation (FAR) Part 49.112-1(g) addresses the effect of overpayment and how the interest shall be computed.

EXHIBIT A

## FINDINGS OF FACT

The Contract:

4) Based upon full and open competition, on 11 February 1991, Contract No. DACA87-91-C-0019, Shared Energy Savings Program, Aliamanu Family Housing Area, Oahu, Hawaii was awarded to Co-Energy Group (CEG) (see Standard Form 26 executed by the Procurement Contracting Officer (PCO), Mr. James W. Reynolds at TAB C-1). At the time of award, CEG certified that it was a California Corporation, was not a Small Business, that its Tax Payer Identification Number (TIN) was 95-3930946, that its President was Mr. Robert Freeman, its Executive Vice President was Mr. Thomas Mitchell, and its Vice President was Mr. George Jones. After the contract was awarded, the contract was transferred to the United States Army Corps of Engineers, Honolulu Engineer District (HED) for administration, and payments under the contract were to be made by the United States Army Corps of Engineers, Pacific Ocean Division (POD).

5) The Contract required the Contractor to provide and install energy savings equipment, and to provide operating and maintenance services, at the Aliamanu Military Reservation (AMR) family housing complex in Honolulu, Hawaii, that would result in a reduction in AMR's monthly energy and maintenance expenditures. The energy savings equipment and services were to be provided by the Contractor, at the Contractor's expense, and the only payments that the Contractor would receive under the contract were to be based upon a pre-established percentage of the avoided energy and maintenance expenditures over a maximum term of fifteen (15) years[1], with a limitation that the amount paid to the Contractor for the maintenance savings could not exceed the amount paid for the energy savings[2].

6) At the time the contract was awarded, the AMR family housing complex consisted of 1,510 town house units, 1,090 apartment units, and support facilities including a Recreational Center with a swimming pool, a Shopette/Gas Station, a Burger King, a Chapel Annex, and Athletic Fields. The energy expenditure at AMR was to be reduced through the implementation of Contractor developed and proposed Energy Conversation Projects (ECP's), subject to the acceptance of the Contracting Officer. Since air conditioning was the largest energy consumption system at AMR, the Contractor was required to develop an ECP to modify or replace the existing air conditioning system, and the Contractor was required to investigate potential ECP's involving the replacement of the interior and exterior incandescent bulbs with fluorescent bulbs and improving attic ventilation. The Contractor included ECP's for these required items, as well as for other items, as part of its proposal for the contract, and the PCO accepted the Contractor's proposed ECP's through the award of the contract. Under the terms of the contract, after award of the contract the Contractor could propose additional ECP's to the Administrative Contracting Officer (ACO) for acceptance by the ACO.

[1] Section C, Paragraph 1.3 of the contract clearly stated a "maximum" duration of fifteen years, implying that the contract duration could be less than the stated maximum.

[2] Section C, Paragraph 1.4 of the contract stated that the monthly payments to the Contractor would consist of an energy savings component and a maintenance savings component (which could not exceed the amount paid for the energy savings component).

EXHIBIT A

7) The contract contained several Contract Clauses that are relevant of this issue, including:

   a) H.29, 52.249-4010, Termination for Convenience (TAB C-2);

   b) I.14, 52.215-0001, Examination of Records by Comptroller General (APR 1984) (TAB C-3);

   c) I.15, 52.215-0002, Audit - - Negotiation (DEC 1989) (TAB C-4);

   d) I.16, 52.215-0022, Price Reduction for Defective Cost or Pricing Data (APR 1988) (TAB C-5);

   e) I.28, 52.222-0008, Payrolls and Basic Records (FEB 1988) (TAB C-6);

   f) I.48, 52.230-0003, Cost Accounting Standards (SEP 1987) (TAB C-7);

   g) I.49, 52.230-0004, Administration of Cost Accounting Standards (SEP 1987) (TAB C-8);

   h) I.50, 52.230-0005, Disclosure and Consistency of Cost Accounting Practices (SEP 1987) TAB C-9);

   i) I.50, 52.230-0006, Consistency of Cost Accounting Practices (SEP 1987) (TAB C-10);

   j) I.54, 52.232-0017, Interest (APR 1984) (TAB C-11);

   k) I.56, 52.233-0001, Disputes (APR 1984) (TAB C-12);

   l) I.69, 52.236-7000, Composition of Contractor (JAN 1965) (TAB C-13);

   m) I.75, 52.249-0002, Termination for the Convenience of the Government (FIXED-PRICE) (APR 1984) (TAB C-14); and

   n) I.76, 52.249-0002-I, Termination for the Convenience of the Government (FIXED-PRICE) (APR 1984) – Alternate I (APR 1984) (TAB C-15).

8) During the contract, several contract modifications were issued that are particularly relevant to the resolution of the termination and the establishment of the final price of the terminated contract. These relevant contract modifications are identified and briefly discussed in the following paragraphs:

   a) Approximately eighteen (18) months after award of the contract, based upon CEG's written request (TAB C-16), by Modification No. P00009 (See TAB C-17) on 3 September 1992 the contract was novated from CEG to Cegali, Inc. (Cegali). At the time of the novation, CEG represented that Cegali was wholly owned by CEG; and Cegali represented that it was a California Corporation and that its President was Mr. Robert Freeman

   b) Approximately three (3) years later, based upon Cegali's written request (TAB C-18), by Modification No. P00035 (See TAB C-19) on 23 March 1995 the contract was again novated, this time from Cegali, Inc. to the Aliamanu Conversation Partners L.P. (ACP). At

EXHIBIT A

the time of this novation, ACP was represented as being a Limited Partnership established in Hawaii, with Cegali, Inc. (California) being its General Partner.

c) As a result of modifications P00009 and P00035; when the contract was terminated for the convenience of the Government, the Contractor was the Hawaii-based Aliamanu Conversation Partners L.P. (ACP), not the California-based Cegali, Inc. nor the California-based Co-Energy Group (CEG)[3].

d) Approximately six (6) months later, on 13 September 1995, in an undated document entitled "Aliamanu Conservation Partners, LP, Discussion Document Concerning the Failure of Metered Energy Savings to Match Actual Energy Savings" (TAB C-20) the Contractor contended that the contract was in danger of failing financially. The Contractor alleged that the implemented energy conservation measures should have resulted in a greater energy savings[4] – and since the energy saving was being determined by the difference between the actual energy used by AMR and the energy consumption baseline contained within the contract, the Contractor contended that there must have been a problem with the energy consumption baseline set forth in the original solicitation for the contract. After lengthy negotiations, the Contracting Parties ultimately agreed to change the Government-developed pre-award AMR energy consumption baseline – essentially increasing the projected energy consumption levels at AMR. By moving the energy consumption baseline upward, there would then be a greater difference between the new energy consumption baseline and the actual energy readings, which in turn would reflect an increased monthly energy savings, and would result in increasing the monthly payments to the Contractor. The agreement to change the contract's original energy consumption baseline was memorialized in a nine-page document entitled "Amended Agreement in Principle" that was signed by the Contracting Parties (and others) on 31 May 1996 (See TAB C-21).

e) On 27 February 1998 Modification No. P00050 (TAB C-22) was issued to incorporate the 31 May 1996 "Amended Agreement in Principle" into the Contract – and by doing so, replaced the original pre-award energy consumption baseline (that was the Table at Section C, Paragraph 12.0) with a "new" post-award energy consumption baseline (on pages three and four of the "Amended Agreement in Principle") – which beginning on 1 January 1996 reflected an increase to the baseline that would be used to determine the energy savings and thus the energy savings component of the payments to the Contractor. Modification No. P00050 did not change the contract specified method of determining the performance-based payments to the Contractor, and payment amounts were based upon comparing actual monthly AMR energy readings to the revised energy consumption baseline.

f) Even after payments to the Contractor were based upon the revised energy consumption baseline and while the number of housing units at AMR were being reduced, the Contractor asserted that the monthly payments it was receiving were less than it expected to receive and that the Contractor was still losing money. Lengthy negotiations were again conducted,

[3] Although the Contractor changed twice during the contract, unless specifically identified otherwise, the term "the Contractor" is used throughout this Decision to mean the Contractor at the particular point in time being discussed.

[4] The Contractor contended that it had anticipated receiving larger payments because of the energy savings equipment that had been installed.

EXHIBIT A

during which the Contracting Parties agreed to convert the performance-based monthly payments into fixed-priced payments subject to adjustments associated with the Consumer Price Index (CPI).

g) Based upon this bilateral agreement, Modification No. P00100 was issued on 4 February 1999 (TAB C-23), which in effect converted the nature of the shared energy savings contract from a performance-based contract into a fixed price contract with an economic adjustment factor. Before Modification No. P00100 was executed, monthly payments to the Contractor were based upon measuring the actual energy consumed at AMR and comparing the measured energy consumption to the energy consumption baseline contained within the contract. However, after Modification No. P00100 was issued, the monthly payments to the Contractor were to be based upon fixed amounts adjusted by application of a CPI factor. The term of the contract was not modified; remaining a maximum duration of 15 years.

h) By modification number P00212 dated 12 August 2004 (TAB C-24), the Contracting Officer notified ACP that the contract was being terminated for the convenience of the Government effective as of 30 September 2004, and requested that ACP provide its termination settlement proposal within one year from the effective date of the termination.

9) A total of two hundred and eleven (211) contract modifications were issued prior to the Notice of Termination, and two (2) contract modifications were issued after the Notice of Termination; resulting in a total of 214 contract modifications (See Modification Summary at TAB C-25). In addition to the modifications referred to in the above paragraphs, forty (40) modifications were administrative in nature and did not affect the substantive rights of either contracting party; however a total of one hundred and sixty seven (167) modifications involved the establishment of unit priced line items for additional work[5]. As reflected in the Modification Summary (TAB C-25), the contract was increased by a total of $1,275,226[6] for the additional work incorporated into the contract by the contract modifications. As a result of the contract modifications, payments to the Contractor consisted of three (3) parts; an energy savings component, a maintenance savings component, and an additional work component.

10) Prior to the Notice of Termination a total of one hundred and sixty seven (167) payments were made to the Contractor, and another payment was made in November 2004 for the Contractor's work under the contract for the month of September 2004 (See Contract Payment Summary at TAB C-26); as a result, the Contractor was paid a total of $46,379,724.15[7] for its pre-termination work. After the Notice of Termination, two (2) partial termination payments ($536,333.92 each) were made to the Contractor; resulting in post-termination partial payments of $1,072,667.84. To date, one hundred and seventy (170) payments have been made to the Contractor for a total of $47,452,391.99[8].

---

[5] The two contract modifications issued after the Notice of Termination definitized the estimated quantities associated with the unit priced line items, and thus definitized the amount that the Contractor was compensated for the additional work. It is presumed that the cost that the Contractor incurred performing the additional unit priced line item work required by the modifications was included in the Contractor's total cost incurred under the contract.

[6]For consistency, all dollar amounts contained within this COFD have been rounded-off to the nearest dollar.

[7]Within this COFD, this amount has been rounded-off to $46,379,724.

[8] Within this COFD, the total payment amount has been rounded-off to $47,452,392.

EXHIBIT A

The Dispute

11) After the subject contract was awarded in 1991, the U.S. Army began examining other ways to manage its military housing cost, besides reducing energy and maintenance cost. The U.S. Army investigated possible privatization initiatives, where cost savings could be realized by turning-over existing military housing facilities to private contractors, which in turn would be responsible for operating and maintaining the existing housing facilities and for designing and constructing new housing facilities. Under the Army's privatization initiative, the Army subsequently entered into a long-term contractual arrangement with a private firm, Actus Lend Lease LLC, to build, maintain, and operate Army housing on the island of Oahu (which included the AMR housing area), with Notice to Proceed to be issued on or about 1 October 2004. Per e-mail message, dated 28 July 2004 (TAB D-1), from Ms. Joyce VanSlyke, RCI Program Manager, Office of the Assistant Secretary of the Army for Installation and Environment, Ms. VanSlyke recommended the termination the existing energy savings contract. Ms. VanSlyke stated in her message that "Due to the implementation of the RCI Project in Hawaii and the housing renovation and development plan/schedule, it would be in the best interest of the government not to continue this contract. The Army's privatization partner in Hawaii, Actus Lend Lease will take over the assets and operations and draw rent for the quarters on 1 Oct 04."

12) Based upon the needs of the Government, on 12 August 2004 the Contracting Officer notified ACP that the contract was being terminated for the convenience of the Government effective as of 30 September 2004, and requested that ACP provide its termination settlement proposal within one year from the effective date of the termination (See TAB C-24).

13) A termination coordination meeting was held with ACP (Mr. Robert Freeman and Mr. George Jones) at HED on 18 August 2004. Representing HED was Mr. David Kam, Termination Contracting Officer (TCO), Mr. Richard Totten, Office of Counsel, Mr. Bruce Stevenson, Civil Engineer/Contract Administrator, and Mr. Randall Mita, Civil Engineer/Contracting Officer's Representative. Representing DPW Hawaii RCI Office was Keith Nishioka. Contract modification no. P00212, dated 12 August 2004 and the incorporated Notice of Termination letter dated 12 August 2004, was discussed at the meeting. It was brought to the ACP's attention that in accordance with paragraph (c) of the notice of termination letter, the TCO instructed ACP to transfer title and delivery to the Government all termination inventory of the following types or classes identified in that letter, to include a listing of spare parts that it intended to turn over to the Government. Furthermore, a listing of the on-site activities that ACP must coordinate with Mr. Mita, to include demobilization from AMR was listed in paragraph (f) of the notice of termination letter. The requisite termination settlement forms was brought to ACP's attention, which was addressed in paragraph (2) (i) of the notice of termination letter. Apparently, it was ACP's intent to negotiate a settlement amount at this meeting. The TCO explained to ACP that its termination settlement proposal must be submitted on one of the required settlement proposal forms and as previously advised in paragraph (2) (ii) of the notice of termination letter - if its proposal exceeds $100,000 it must include Cost or Pricing Data and the proposal will be audited by the Defense Contract Audit Agency (DCAA). The TCO advised ACP that upon receipt of the DCAA audit report, the Government will

EXHIBIT A

develop a Prenegotiation Objective Memorandum and will then conduct negotiations with ACP to arrive at a termination settlement amount.

14) Subsequent to the termination coordination meeting, the Contractor referring to the required settlement proposal forms identified in Federal Acquisition Regulation (FAR) Part 49.602, as well as the provision contained at FAR 49.206-1; indicated that the forms did not appear to be appropriate for this particular contract, and requested that the TCO waive the requirement for these forms. As a result of this request, the TCO informed the Contractor that it was more important for the Contractor to provide complete, current and accurate information, so that a termination settlement amount could be established, than using any particular termination settlement form.

15) By letter dated 20 June 2005, Cegali, Inc. (with a Nevada not California address) submitted what it called its "Costing Methodology For The Termination Of The Aliamanu Contract" and provided its "Proposed Termination Settlement Costs" in the amount of $9,764,061 (TAB D-2). Within the transmittal letter Cegali, Inc. referred to itself as the General Partner of ACP, represented that the proposal was being submitted for ACP, and the letter was signed by Mr. Robert Freeman. The elements and amounts contained in the 20 June 2005 termination settlement proposal are summarized in the following table:

| Item | Description | | Amount |
|---|---|---|---|
| 1 | Amortization of Initial Costs | * | $1,575,767 |
| 2 | Amortization of Operating Costs | * | $6,929,721 |
| 3 | Termination Expenses | * | $212,117 |
| 4 | Termination Settlement Costs | | $174,696 |
| 5 | Subtotal = | | $8,892,301 |
| 6 | Fee (Profit on "*" Items 1 - 3) | 10.00% | $871,760 |
| 7 | Total Termination Settlement Amount | | $9,764,061 |

16) A review of the 20 June 2005 proposal revealed that, as anticipated, the proposal had not been prepared using one of the termination settlement proposal forms; but the proposal did not appear to be a termination settlement proposal (as defined in Federal Acquisition Regulation (FAR) 49.001) since it did not appear to be a proposal for a final contract price, and instead, the proposal appeared to consist primarily (items 1 & 2) of estimated amounts not received, because the contract had been terminated - instead of identifying the Contractor's actual costs incurred during the performance of the contract; and the proposal did not include the Contractor's Cost or Pricing Data (all relevant facts). It appeared as though the Contractor's proposed amounts had been estimated or calculated as described below:

a) Item 1 – Amortization of Initial Costs. It appeared that the Contractor may have started with its total incurred cost (presumably all of its labor, equipment, materials, overhead, subcontractors, financing, etc.) to some unspecified point in 1993[9], the total of which the Contractor then added cost of money and distributed that total amount over 156 months, to

[9] The Contractor referred to the period of time from contract award to this point in time as the "Construction Phase" of the contract, during which most of the energy savings equipment was installed at AMR. The Contractor then referred to the period of time after the Construction Phase, to the effective date of the termination, as the "Maintenance" (or Operation) Phase of the contract, during which very little additional energy saving equipment was installed and the Contractor's primary work involved performing the operations or maintenance services. For consistency, these terms are used throughout this final decision.

EXHIBIT A

arrive at the claimed amount associated with the 16.3 months occurring after the contract was terminated and during which there had been no performance by the Contractor because of the termination. Essentially, it appeared as though the Contractor was contending that it was in a loss position when the contract was terminated because it had not yet recovered its cost associated with installing the energy savings equipment at the beginning of the contract.

b) Item 2 – Amortization of Operating Costs. The Contractor's amount appeared to be based upon a similar calculation; where the Contractor had totaled its monthly Operating and Maintenance cost from contract award until the contract was terminated; and then projected an amount across the 16.3 months after the effective date of the contract termination. This item was extremely confusing, since it appeared that the Contractor was in effect estimating the Operating and Maintenance cost that the Contractor would have incurred if the contract had not been terminated, which the Contractor did not incur because the contract was terminated.

c) Item 3 – Termination Expenses. The Contractor contended that it incurred a total of $212,117 associated with demobilizing from the AMR Housing Area after the effective termination date of the contract. Although some of the cost elements included under this item appeared questionable, in general this item appeared to appropriately represent a portion of the Contractor's post termination cost.

d) Item 4 – Termination Settlement Costs. To prepare the proposal and to conduct future negotiations, the Contractor contended that it incurred or would incur a total of $174,696 for a Consultant, for Legal Fees, and for Mr. Freeman's involvement in preparing and processing of the termination settlement. Although some of the estimated amounts included under this item appeared questionable, in general this item appeared to appropriately represent the remainder of the Contractor's post termination cost.

e) Item 6 – Fee (or Profit). The Contractor's proposal included profit calculated at a rate of ten (10) percent applied to the first three elements in the proposal; however, the Contractor did not provide any calculation demonstrating that it was in a profit position - as required by Federal Acquisition Regulation (FAR) 49.203. Instead, as highlighted above, by including Item 1 "Amortization of Initial Costs" in its proposal, it appeared that the Contractor was contending that it was in a loss position when the contract was terminated, and in accordance with FAR 49-203, no profit could be allowed if the Contractor would have incurred a loss had the entire contract been completed.

17) After receipt of the 20 June 2005 proposal, the TCO informally notified Mr. Freeman that the termination settlement proposal had not been prepared in accordance with FAR Table 15-2, and that the proposal did not contain ACP's Cost <u>or</u> Pricing Data. By letter dated 5 July 2005 (TAB D-3), Mr. Freeman (on behalf of ACP) provided what he called ACP's "Certificate" and ACP's "Certificate of Current Cost or Pricing Data." Mr. Freeman signed a "Certificate of Current Cost or Pricing Data" but, did not provide ACP's Cost or Pricing Data (all relevant facts). In the "Certificate," Mr. Freeman stated that the proposal had been prepared "from the books of account and records of the Contractor in accordance with recognized commercial accounting practices…"

EXHIBIT A

18) By letter dated 25 July 2005 (TAB D-4), the TCO referred to the previous discussion with Mr. Freeman and formally notified ACP that the Contractor needed to submit a termination settlement proposal complying with the requirements of FAR Table 15-2 that included the Contractor's Cost or Pricing Data as defined by FAR 2.101. In response to the TCO's 25 July 2005 letter, the TCO received a letter from Government Contract Associates (GCA) dated 1 August 2005, signed by Mr. William Lennett (see TAB D-5). In that letter, Mr. Lennett, identified himself as a former DCAA auditor and a consultant to Mr. Freeman; and inexplicably contended that the submission of Cost or Pricing Data and the Truth in Negotiations Act (TINA) did not apply to, and were irrelevant to, a termination settlement proposal.

19) Instead of complying with the TCO's request to provide a proper termination settlement proposal, representatives (consultants) of Mr. Freeman initiated several different discussions and email correspondence with various representatives of the TCO arguing that the Contractor was not required to submit its Cost or Pricing Data. In general, the TCO's representatives repeatedly referred to the FAR requirements, insisted that Cost <u>or</u> Pricing needed to be submitted by the Contractor; and that the settlement amount should be based upon the cost that the Contractor incurred under the contract; while Mr. Freeman's representatives insisted that they had provided Cost <u>and</u> Pricing Data, and that the settlement amount should be based upon the value of the Contractor's work performed under the contract, and that the Contractor should receive the fixed monthly payments that had not made because the contract had been terminated (essentially arguing that the Government had breached the contract and that the Contractor was entitled to remaining unpaid contract amount).

20) By letter dated 19 August 2005 (TAB D-6), the TCO referred to previous correspondence and reminded ACP that the Contractor needed to submit a termination settlement proposal complying with the requirements of FAR Table 15-2 that included the Contractor's Cost or Pricing Data. In that letter, the TCO asked ACP to explain Mr. Lennett's role and authority in the termination settlement, and reminded ACP that the requirement for ACP to submit its Cost or Pricing Data had been clearly set forth in the Notice of Termination (see TAB C-24).

21) By letter dated 6 September 2005 (TAB D-7), Mr. Freemen contended that FAR Part 15 did not apply to his termination settlement proposal and that the proposal was supported by accounting data. With that letter, Mr. Freeman addressed the questions contained in the General Instruction of FAR Table 15-2 (essentially the proposal cover page information), but did not provide a revised proposal that identified, referenced, or incorporated ACP's Cost or Pricing Data.

22) Nearly two months later, by letter dated 31 October 2005 (TAB D-8); Cegali, Inc. submitted what it called its "Revised Proposal" and provided its "Termination Settlement Proposal" in the amount of $7,641,772. The letter was signed by Mr. Freeman for Cegali, Inc. as the General Partner of ACP, and the revised proposal consisted of the following elements:

| Item | Description | | | Amount |
|---|---|---|---|---|
| 1 | Monthly Payments | | | $5,519,180 |
| 2 | Unamortized Asset Value | | * | $1,329,807 |
| 3 | Termination Expenses | | * | $335,077 |
| 4 | Termination Settlement Costs | | | $186,331 |
| 5 | | Subtotal = | | $7,370,395 |
| 6 | Fee (Profit on "*" Items 2 & 3) | | 16.30% | $271,376 |
| 7 | Total Termination Settlement Amount | | | $7,641,772 |

23) A review of the 31 October 2005 proposal revealed that although the methodology used in the revised proposal was different than the initial proposal, the revised proposal still appeared to consist primarily of estimated amounts that had not been paid because the contract had been

EXHIBIT A

terminated, instead of identifying the actual costs the Contractor had incurred before the contract was terminated, and the revised proposal still did not include the Contractor's Cost or Pricing Data. It appeared as though the Contractor's revised amounts had been estimated or calculated as described below:

a) Item 1 – Monthly Payments: The proposed amount appeared to represent the fixed monthly payments (consisting of both the energy savings and the maintenance savings components) that the Contractor would have received had the contract not been terminated (essentially, the fixed contract amount remaining when the contract was terminated – without any adjustment for the CPI). It appeared that the Contractor was contending that the Government had breached the contract (like the contract was a commercial contract instead of a Federal Government contract), and as a result the Contractor was claiming that it was entitled to the remaining unpaid contract balance. This element was problematic at best since payment of any "energy savings component" after the effective date of the termination would essentially represent anticipatory profit; and it was difficult to understand how the Contractor could, in any way, be entitled to payment for the maintenance component after the contract was terminated during which the Contractor did not perform any maintenance.

b) Item 2 – Unamortized Asset Value: The proposed amount appeared to be based upon the cost to provide and install the energy savings equipment under the contract, distributed across the maximum number of months in the contract, and then that monthly amount had been multiplied by the maximum number of months remaining after the effective date of the termination. This item was also problematic since it appeared that the Contractor was contending either 1) that even if it were to receive all of the remaining fixed monthly payments under the contract (under Item 1 of the revised proposal), it wouldn't be sufficient to ensure recovery of its initial cost to install the energy savings equipment (this Item); or 2) that it had included this item in its proposal as an alternate amount (in case it could not recover Item 1). In either case, it seemed that the Contractor's proposed amounts were excessive, since under the first contention, the Contractor would be indicating that it was in a loss position, and the proposed amount would be overstated by at least the amount of the profit; and under the second contention, the proposed amount would be overstated by at least the amount included under Item 1 of the proposal.

c) Item 3 – Termination Expenses: The proposed amount was approximately $120,000 higher than the corresponding item in the Contractor's initial proposal, but still appeared to consist of alleged costs associated with demobilizing from the AMR Housing Area after the effective date of the termination.

d) Item 4 – Termination Settlement Costs: The proposed amount was approximately $12,000 higher than the corresponding item in the Contractor's initial proposal and still appeared to consist of incurred and estimated amounts for Mr. Freeman, a Consultant (Mr. Lennett), and Legal Fees (Mr. Power) associated with preparing the two different termination settlement proposals and to negotiate a termination settlement.

e) Item 6 – Fee (or Profit): The proposal included 16.3 percent profit on the second and third elements of the proposal; however, the Contractor still did not provide any calculation demonstrating that the Contractor was in a profit position when the contract was terminated,

EXHIBIT A

or would have been in a profit position had the contract not been terminated - as required by Federal Acquisition Regulation (FAR) 49.203.

24) The TCO promptly notified Mr. Freeman that the revised proposal still had not been prepared in accordance with the requirements set forth in FAR Table 15-2, and that the revised proposal still did not contain ACP's Cost or Pricing Data. Instead of complying with the TCO's request to provide a proper termination settlement proposal, Mr. Freeman's consultants initiated another round of informal discussions contending that Cost or Pricing Data was not required and that the settlement amount should be based upon the value of the Contractor's work provided under the contract instead of being based upon the Contractor's cost incurred prior to the effective date of the termination.

25) The TCO's attempts to have the Contractor specifically identify its actual cost incurred during the performance of the contract, and to submit its Cost or Pricing Data continued until 20 December 2005 when the TCO received a letter from the Law Offices of Timothy H. Power (TAB D-9), which referred to Mr. Freeman's October Termination Settlement Proposal, and indicated that attached to the letter were "documents that support the cost and pricing data submitted with the proposal." Review of the submission revealed that the documents attached to that letter did, to a certain extent, lend some support to the cost information and the pricing information previously provided by Mr. Freeman; however, the documents attached to that letter still did not represent ACP's Cost or Pricing Data (all relevant facts).

26) In an email message to the TCO dated 2 February 2006 (TAB D-10), Mr. Freeman characterized the various discussions and correspondence regarding the requirement for the Contractor to submit its Cost or Pricing Data as being "negotiations on the settlement proposal," stated that the "negotiations" were at an impasse, and requested that the TCO issue a Contracting Officer's Final Decision. Because the TCO had made several unsuccessful attempts to have the Contractor submit its Cost or Pricing Data, and it appeared that no amount of explanation or direction from the TCO would result in the Contractor actually providing the relevant facts (including the Contractor's actual cost incurred prior to the effective date of the termination), the TCO informally suggested to Mr. Freeman that as a compromise the TCO could review the Contractor's records to determine what facts the Contractor might have that could be submitted; Mr. Freeman agreed and indicated that the Contractor's records would be available at Co-Energy Group's office in Las Vegas, Nevada.

27) After the TCO began making travel arrangements to review the Contractor's records in Nevada; in an email message to the TCO dated 15 February 2006 (TAB D-11), Mr. Freeman questioned the TCO's authority to review the Contractor's records associated with the contract and specifically questioned the TCO's authority to review and examine records that may have not been used by the Contractor in preparing its termination settlement proposal (i.e., factual items that did not necessarily support the cost information or the pricing information contained in the Contractor's proposal).

28) In a letter dated 16 February 2006 (TAB D-12) the TCO responded to Mr. Freeman's questions regarding the TCO's authority to review and examine the Contractor's records and provided several references to various contract clauses granting the Contracting Officer such authority. In that letter the TCO also referred to Mr. Freeman's characterization of the TCO's numerous and

repeated requests for the Contractor to submit its Cost or Pricing Data as being some sort of negotiations; and advised Mr. Freeman that the TCO's requests for the submission of Cost or Pricing Data were not any type of negotiations, but rather had been requests for the Contractor to comply with the terms of the contract.

29) In a separate letter dated 23 February 2006 (TAB D-13), the TCO formally responded to Mr. Freeman's 2 February 2006 email request for a Contracting Officer's Final Decision. In that letter, the TCO reiterated that the TCO's previous requests for the Contractor to submit its Cost or Pricing Data had not been negotiations, and the TCO explained that negotiations regarding the termination settlement had never been initiated, and that the only apparent "impasse" involved whether or not the Contractor was required to submit its Cost or Pricing Data; and as a compromise the TCO had suggested personally reviewing the Contractor's records. The TCO informed Mr. Freeman that the TCO did not believe that the situation had yet ripened into an actual Contract Disputes Act (CDA) claim and that although the Contractor had a right to submit a properly prepared and certified claim, Mr. Freeman's 2 February 2006 email request for a Contracting Officer's Final Decision did not contain accurate and complete supporting data and was not properly certified.

30) From 6 March 2006 through 10 March 2006 the TCO personally reviewed the records made available at Co-Energy Group's office in Las Vegas, Nevada (see TAB D-14). During that visit, and as a result of the review of those records, the TCO orally requested that specific information, that appeared to be readily available from the records, be submitted to the TCO. The requested "Information Other than Cost or Pricing Data" requested by the TCO consisted of the following:

a) Regarding the "Unamortized Asset Value" – the TCO requested that the Contractor submit:

i) A listing of the specific "energy savings" equipment that was purchased and installed under the contract;

ii) The specific date each piece of listed equipment was purchased;

iii) The specific amount paid for each listed piece of equipment; and

iv) The amount of depreciation already recovered for each listed piece of equipment.

b) Regarding the "Termination Expenses" – the TCO requested that the Contractor submit:

i) An explanation as to why the list of materials turned-over to the Government (directly to Actus Lend Lease – the privatization contractor) contained in the proposal was different than the signed list of materials that had actually been turned-over; and

ii) A narrative explaining how the corporate identity of the Contractor had changed from the entity that was awarded the contract to the entity that was currently representing itself to be the Contractor.

c) Although, during the meeting in Nevada, Mr. Freeman orally agreed to provide the specific information the TCO requested, and was later reminded by the TCO several times to provide

EXHIBIT A

the requested "Information Other than Cost or Pricing Data;" as of the date of this Contracting Officer's Final Decision, none of the information specifically identified and requested by the TCO has been submitted by the Contractor.

31) In accordance with FAR 15.404-1(e), a Technical Analysis Report (TAR) of the Contractor's proposal for the termination was completed on 9 May 2006 (TAB D-15). The TAR addressed the 20 June 2005 proposal, the 31 October 2005 revised proposal, as well as the 20 December 2005 submission, and various documents that were obtained during the review of the records made available at Co-Energy Group's office in Las Vegas, Nevada. The TAR commented on the absence of the Contractor's Cost or Pricing Data, addressed the method set forth in the FAR to establish the final contract amount resulting from the termination, and using some of the information provided by the Contractor in its initial proposal, attempted to estimate whether or not the Contractor had been in a profit position when the contract had been terminated.

32) Since the Contractor's proposal exceeded $100,000, in accordance with FAR 49.107, on 17 March 2006 the TCO requested that the Defense Contract Audit Agency (DCAA) perform an audit of the Contractor's termination settlement proposal; and on 23 August 2006, the DCAA issued Audit Report No. 04141-2006G1710002 (TAB D-16). Similar to the TAR, the audit report concluded that the Cost or Pricing Data submitted by the Contractor was not adequate; that the proposal did not comply with the requirement of FAR; and that the Contractor's proposal did not provide an acceptable basis for negotiating a fair and reasonable contract termination settlement amount. In the audit report the DCAA stated that in order to make the proposal adequate for negotiations, the Contractor would need to submit a termination settlement proposal based upon the cost it had incurred, supported by Cost or Pricing Data that included references to the Contractor's accounting books and cost records supporting the proposed amount, instead of submitting a proposal based upon the payments not made because the contract had been terminated.

33) As a result, both the TAR and the DCAA had reported that the Contractor's proposals did not provide an acceptable basis for negotiating a fair and reasonable contract termination settlement amount; but in order to comply with FAR 49.103 (d), the TCO could only issue a unilateral termination settlement determination when the settlement amount could not be resolved through negotiations and FAR 15.406-1 required the TCO to establish prenegotiation objectives before entering into negotiations with the Contractor. As a result, and in order to begin negotiations, a Prenegotiation Objective Memorandum (POM) was completed on 18 September 2006 (TAB D-17) setting forth the prenegotiation objective. The POM contained a review of the related events, addressed the Contractor's different proposals, including the detrimental effect that the absence of Cost or Pricing Data could have on the negotiations, referred to the TAR and the DCAA's audit report, and provided various calculations that estimated the Government's maximum liability associated with the terminated contract. Based upon the analyses recorded in the POM, two prenegotiation objectives were established; i) to limit the Government to any further liability, by issuing a termination settlement either bilateral or unilateral if necessary; and ii) to establish a final contract price resulting from the termination at or below the Government's maximum liability amount of $46,769,252.

34) The TCO reviewed the POM, dated 18 September 2006, that was prepared by Mr. Bruce Stevenson. Per the TCO's cover memorandum for record, dated 28 September 2006 (TAB D-

EXHIBIT A

18) the TCO agreed with the POM's recommendation that the most immediate objective should be to limit the Government to any further liability by issuing a termination settlement, either bilateral or unilateral if necessary. The TCO stated that it would not be in the Government's best interest to continue to request the Contractor's Cost or Pricing Data, since the Contractor has failed to provide that data after numerous written requests from the TCO. The TCO agreed with the POM's second pre-negotiation objective, which was to establish a final contract price at or below the Government's maximum liability amount of $46,769,252.

35) As documented in the Price Negotiation Memorandum (PNM) dated 24 October 2006 (TAB D-19) negotiations was scheduled and conducted telephonically on 3 October 2006. During negotiations, the Government proposed a settlement amount of ($6,221,395) that was overpaid to ACP and was due the Government. This proposed settlement amount was based on the settlement proposals received, the TAR, the DCAA audit report, and a cost analysis. The Contractor did not accept this settlement offer. In an attempt to reach a negotiated settlement and to avoid litigation, the Government proposed an alternate settlement amount of ($683,140) that was overpaid to ACP and due the Government. The Contractor did not accept the alternate settlement offer and indicated that negotiations were at an impasse, since it expected to receive additional payments of approximately $6 million for termination settlement. During negotiations, the Contractor (Mr. Robert Freeman) orally requested that the TCO issue a Contracting Officer's Final Decision so that the Contractor could make his presentation to the court.

## DISCUSSION

36) As awarded, the subject contract was neither a Firm Fixed-Price contract nor a Fixed-Price contract, since the only contract payments the Contractor could expect to receive depended upon the Contractor's ability to reduce AMR's monthly energy and maintenance expenditures (Contract Section C, Paragraph 11.2). However, Modification No. P00100 effectively converted the nature of the contract from a performance-based contract into a fixed price contract, with an economic adjustment factor. As a result, on 12 August 2004, when the Contractor was notified that the contract was being terminated for the convenience of the Government, the contract was a fixed-priced contract subject to FAR Part 49 and the requirements set forth in FAR 49.2.

37) FAR 49.001 defines a "Settlement Proposal" as being "a proposal for effecting settlement of a contract terminated in whole or in part, submitted by a contractor or subcontractor in the form, and supported by the data, required by this part." Under this terminated contract, the TCO received three separate submissions: i) the 20 June 2005 proposal, reflecting a total proposed amount of $9,764,061 (TAB D-2); ii) the 31 October 2005 proposal, reflecting a total proposed amount of $7,641,772 (TAB D-8); and iii) the 20 December 2005 letter providing some limited information related to the previously proposed amount of $7,641,772 (TAB D-9). However, despite specific instructions from the TCO, the Contractor never complied with the TCO's instructions and never provided a viable "settlement proposal" as defined by FAR 49.001. A close reading of each of the three submissions failed to disclose any indication of what the Contractor believed the final contract price should be as a result of the termination. Clearly, the proposed amounts of either $9,764,061 or $7,641,772 can not reflect what the Contractor believes should be the final contract price. One could assume that the Contractor believed that

EXHIBIT A

the final contract price should be the summation of the payments already made plus the proposed amount; although that is not stated by the Contractor in either proposal, and even then, one would then need to make another assumption regarding whether the "payments already made" were to include or exclude the partial termination payments made after the effective date of the termination.

38) In this case, the TCO ensured that the Contractor was informed of the Contractor's obligation to submit Cost or Pricing Data (as defined by FAR 2.101) before the termination notice was issued; ensured that the Notice of Termination alerted the Contractor of the requirement to include the Contractor's Cost or Pricing Data in its settlement proposal (see TAB C-24, Notice of Termination, paragraph (f) (2) (ii)); and ensured that Modification P00212 reinforced the importance of the Contractor providing complete, current, and accurate Cost or Pricing Data (see TAB C-24, Modification P00212, paragraph (14) (d)); all in compliance with FAR 49.105, paragraph (c) (15) which required the TCO to inform the Contractor of the -

> Obligation of the contractor to furnish accurate, complete, and current cost or pricing data, and to certify to that effect in accordance with 15.403-4(a)(1) when the amount of a termination settlement agreement, or a partial termination settlement agreement plus the estimate to complete the continued portion of the contract exceeds the threshold in 15.403-4.

39) Despite all of these unambiguous notifications, the Contractor did not submit Cost or Pricing Data with its initial 20 June 2005 proposal (TAB D-2); and the TCO's subsequent attempts to have the Contractor furnish Cost or Pricing Data (all relevant facts, including but not limited to, the Contractor's actual cost incurred before the effective date of the termination) were unexpectedly met with stiff refusal and unexpected arguments involving the Contractor's apparent belief that Cost or Pricing Data and the Truth in Negotiations Act (TINA) did not apply, and were irrelevant, to the processing of a termination settlement proposal (see TAB D-5).

40) Subsequent efforts by the TCO (and the TCO's representatives) to explain to the Contractor that FAR 49.201 required the final settlement amount to fairly compensate the Contractor for the work performed up to the effective date of the termination, and that FAR 49.206-2 paragraph (b) (2) required the Contractor to itemize its actual costs incurred under the contract up to the effective date of termination, were met with even stronger resistance and arguments.

41) During those discussions, the Contractor was informed that, as set forth in FAR Part 49 and in Contract Clause I.75 entitled "Termination for the Convenience of the Government" (TAB C-14), the final contract price resulting from the termination needed to be based upon the Contractor's actual cost incurred before the effective date of termination, plus an allowance for profit (provided the Contractor could demonstrate that it was in a profit position), plus the Contractor's allowable, allocable, and reasonable cost incurred, after the effective date of termination, associated with closing-out the contract and preparing the termination settlement proposal with the required Cost or Pricing Data. The Contractor was also informed that after a final contract amount had been established, that final contract amount would be compared to the payments that had already been made under the contract, to determine what additional payment might be owed to the Contractor, or what amount needed to be repaid by the Contractor.

EXHIBIT A

42) In the initial 20 June 2005 proposal (TAB D-2), the Contractor referred to cost information that appeared to indicate that the Contractor had incurred $15,529,422 (14,318,422 -without interest) during the construction phase of the contract, and another $22,714,888 during the maintenance phase of the contract; and Mr. Freeman certified that information on 5 July 2005 (see TAB D-3) as being from the Contractor's records. However, after being repeatedly reminded that Cost or Pricing Data was required to be submitted coupled with an explanation of how the factual information (Cost or Pricing Data) would be used to establish the final contract price; the Contractor began arguing that the final contract price should be based upon the value of the work the Contractor had provided, not the cost associated with performing that work, and abruptly distanced itself from those previously disclosed incurred cost numbers (see TAB D-8 and TAB D-9). Further attempts to have the Contractor provide its Cost or Pricing Data were fruitless, ultimately leading to the TCO's suggestion that the TCO review the Contractor's records to determine what information was available to be submitted.

43) From 6 March 2006 through 10 March 2006 the TCO personally reviewed the records made available at Co-Energy Group's office in Las Vegas, Nevada. Although the TCO prepared a memorandum contemporaneously documenting that visit, there are a number of issues that demand further discussion. The first issue involves the volume of documents that were made available for the TCO's review at that location; and the second involves the number of different corporate entities that appeared to be managed from that single office location.

44) The contract was awarded on 11 February 1991 and was terminated on 30 September 2004, over thirteen (13) years later. For at least the first two (2) years, the Contractor researched, developed, and submitted various different ECP's to the ACO for acceptance; materials and energy savings equipment was ordered, shipped, and installed; and daily construction progress reports, daily quality control reports, monthly certified payrolls, and various requests for payment were prepared and submitted to the ACO. For the remaining eleven (11) years, the Contractor maintained an onsite field office with a substantial staff to perform maintenance work throughout the AMR housing area, to respond to numerous service calls from either the Government or the individual AMR tenants, and to perform monthly administration functions including documenting activities performed, ordering supplies and materials, processing billings, processing payrolls, and submitting monthly contract payment requests.

45) However, the records that were made available for the TCO's review in the one-room office or the small U-Haul storage locker in Nevada contained very little of the above described "normal" contract documents; instead, the records made available to the TCO consisted primarily of various financing agreements and payment records, reflecting amounts that had been paid to various contractors, subcontractors, partners, suppliers, individuals, and others; but there was relatively little cost (or source) documentation demonstrating why payments were being made or what was being purchased by the payment. In addition, the records made available to the TCO included documentation associated with other contracts and/or were associated with several other corporate entities[10]; as a result, one could not readily discern whether certain payments were even associated with the subject contract, or were payments associated with other

[10] For example, within the building where Cegali's office was located, Cegali's incoming mailbox was identified as being a mailbox for several, at least seven (7) different Companies – all either owned or controlled by either CEG or Cegali, or some combination of the owners of CEG.

EXHIBIT A

contracts, or even if the payments were associated with the subject Contractor (ACP) or were instead associated with one of the other companies being managed from that location, or were for items that were purchased for use by more than one company.

46) Despite the relatively sparse nature of the records, coupled with the intermingling of records for different companies, the TCO's review of the records resulted in identifying some documents that appeared to be related to the processing of the subject contract termination[11], as described in the following paragraphs.

a) Mr. Freeman identified a pamphlet entitled "Enron Federal Solutions Inc, & Co-Energy Group" (TAB D-20) that was on display in the Mr. Jones' office, and Mr. Freeman explained to the TCO the association of CEG with Enron. Page 4 of that that pamphlet listed several different contracts that had apparently been awarded to CEG, including the subject contract, and the pamphlet contained a statement that the AMR work had been "implemented at a cost of $14,000,000..."

b) The documents made available to the TCO included various income tax returns, audits, financial statements, and balance sheets. One of those documents was identified as being for the subject Contractor (ACP), had been prepared by the accounting firm, Arthur Anderson LLP, and was entitled "Financial Statements as of December 31, 1996 together with Auditor's Report" (TAB D-21). Among the various items reported in that document, page 3 included an entry indicating that the recorded cost for the energy savings equipment installed at AMR was $14,239,854, with a note regarding accumulated depreciation. Page 10 of that document included a statement that for the year ending December 31, 1996 Cegali Inc. charged the Contractor (ACP) a total of $930,880 for providing the on-going maintenance services for the energy savings equipment installed at AMR.

c) Another document, also identified as being for ACP, and also prepared by Arthur Anderson LLP, was entitled "Financial Statements as of December 31, 1995 together with Accountant's Compilation Report" (TAB D-22); which included an entry on page 3 indicating that the recorded cost for the energy savings equipment installed at AMR was $15,792,939, with a different note regarding accumulated depreciation. Page 10 of that document included a statement that for the year ending December 31, 1995 Cegali Inc. charged the Contractor (ACP) a total of $910,897 for providing the on-going maintenance services for the energy savings equipment installed at AMR.

d) Another document prepared by Gumbiner, Savett, Finkel, Fingleson & Rose, Inc., Certified Public Accounts entitled "Co-Energy Group and Subsidiaries Financial Report – For the Six Months ended [sic] December 31, 1994" (TAB D-23) documented how CEG (and its subsidiaries, including Cegali) accounted for equipment depreciation, on page 8 discussed the creation of ACP, and on page 9 discussed the $1,516,314 difference between the cost of the energy savings equipment (assets) being recorded for CEG (and Cegali) and the cost of the energy savings equipment (assets) being recorded by the Contractor (ACP).

---

[11] The documents referred to in this section, as well as other documents not necessarily referred to in this COFD, were copied from the Contractor's records during the TCO's review of the Contractor's records in Nevada. A duplicate copy of all of the documents obtained by the TCO was also produced and given to Mr. Jones.

EXHIBIT A

e) The records also contained documentation concerning the creation of ACP including a "Bill of Sale" dated 2 August 1993 (TAB D-24) between Cegali Inc, a California Corporation (Seller) and ME Hawaii Inc, a Delaware Corporation (Purchaser). Attached to that Bill of Sale was a 2-page listing of assets including installed energy saving equipment, spare energy saving equipment, and various spare parts needed for maintenance of the energy savings equipment. For example, the listing included under the heading "ClimateMaster" reflected two different size units: 18,000 BTU units (of which 225 had been installed and 3 were spares – for a total of 228 units); and 13,000 BTU units (of which 865 had been installed and 12 were spares – for a total of 877 units), for a combined total of 1,105 ClimateMaster units being transferred from Cegali (CA) to ME Hawaii (DE).

f) Attempts to discern if the purchase price of these units could be identified from the records resulted in locating an invoice from ClimateMaster dated 15 May 1992 (see TAB D-25) reflecting a purchase price of $725,000 for 275 "HS-019GT" units, and 825 "HS-012G" units – for a total purchase of 1,100 ClimateMaster units.

g) Further search through the records, in an attempt to identify the difference between the total number of ClimateMaster units purchased by Cegali and the total number of units transferred to ME Hawaii, and thus to the Contractor (ACP), or at least to explain the difference between the type of units purchased and the types of units installed; resulted in identifying a 17 August 1993 Inter-Office Memorandum (TAB D-26) from Mr. George Jones to Mr. Freeman and Mr. Mitchell (the three owners of CEG). In that memo, George described transferring most of his onsite responsibilities to Mr. Aldecoa, but would retain responsibility for the sale of scrap equipment, trailers, and surplus materials. Attached to that memo was part of a separate 18 August 1993 memo, and an "Inventory to be turned-over to Cegali Inc. AMR." That inventory listed various items of energy savings equipment and parts, including three (3) 18,000 BTU units and twelve (12) 13,000 BTU units, as well as various other equipment and parts.

h) In an undated "Big Distributors Inc." letter to Mr. Freeman and Mr. Mitchell (TAB D-27) George referred to a "Scrap, Surplus, and Trailer Account" and informed the other owners of CEG that he would "resurrect" the account so that the owners could "share" the funds in that account. In that letter, George also indicated that he had used some of the funds in that account for various reasons and asked the other partners how he could get $30,000 "out of" CEG and back into the scrap account, and George suggested that perhaps he could "increase the monthly budget of Hawaii" and then he could "feed it back each month."

i) A document entitled "Aliamanu Military Scrap & Surplus Account" dated 26 October 1995 (TAB D-28) contained a Note reading "AMR Scrap Pile Misc. **Not** Listed on Master Acc't File." This scrap account listed various items of spare parts, trailers, and energy savings equipment (including 32 ClimateMaster units, still in stock), reflected the sales price and buyers for various items, and reflected amounts being paid out of this account directly to the owners of CEG.

47) Based upon discovering this information in the "Contractor's" records, at the conclusion of my review, I referred to Mr. Freeman's termination proposal, and the claimed amount for "Unamortized Asset Value;" and I specifically asked Mr. Freeman to provide to me, in writing, a

EXHIBIT A

detailed listing of the energy savings equipment that was installed at AMR, precisely when each piece of equipment was purchased and its purchase price, when it was installed, and the amount that had already been recovered for that piece of equipment; and he agreed to provide that information. I further asked Mr. Freeman to explain to me, in writing, how the corporate identity of the Contractor had changed from the entity that was awarded the contract to the "entity" that was currently representing itself to be the Contractor; and he agreed to provide that information too. However, to date, Mr. Freeman has not provided any of that information.

48) I do not agree with Mr. Freeman's (and his consultant's) position that factual information (Cost or Pricing Data) and the Truth in Negotiations Act (TINA) do not apply to the negotiation of the final price of a Federal Government contract that is terminated for the convenience of the Government. Nor do I agree with the Contractor's position that the final contract price should be determined as if it were a commercial contract under which the Government breached the terms of the contract by ending the contract earlier than the Contractor anticipated. The fact remains that the subject contract is a Federal Government contract; that the provisions of TINA apply to the termination settlement proposal, the termination negotiations, and the establishment of the final contract price; and that the Federal Acquisition Regulations are quite clear in the method to be used to establish the final contract price.

49) Mr. Freeman's demand for the remaining unpaid fixed monthly payments is severely misplaced. It would be totally unreasonable for a Federal Government Contractor to receive the maintenance component of a monthly shared energy and maintenance payment when no maintenance was performed. Payment of the maintenance component (when no maintenance cost was incurred by the Contractor) as well as payment of the energy saving component, after the contract was terminated would represent payment of "anticipated" profit, which is specifically unallowable.

50) Based on my direct involvement with contract modifications P00050 (TAB C-22) and P00100 (TAB C-23), initially, I was concerned that perhaps the Contractor had still not recovered the cost associated with providing and installing the energy savings equipment. However, two things have since convinced me otherwise: my personal review of the "Contractor's" records; and the fact that the Contractor is claiming profit in the proposal, when profit would only be allowable if the Contractor was in a profit position. I repeatedly asked Mr. Freeman to submit his Cost or Pricing Data (all relevant facts) and after my review I specifically asked Mr. Freeman to submit his "Information Other than Cost or Pricing Data," in part, so that I could be assured that all of the Contractor's pre-termination cost had been properly accounted for and identified.

51) If the Contractor had not recovered all of its pre-termination cost, then it would seem that the Contractor would have been in a loss position if the contract had not been terminated. If the Contractor was in a loss position when the contract was terminated, the Contractor would have incurred additional cost for providing the maintenance (which according to the records was approximately $100,000 per month and increasing), would have incurred the demobilization cost (without any additional reimbursement), would have incurred cost associated with complying with the various contract required submittals (for example, see Contract Section C, paragraphs 5.3, 5.4, 5.4.2, and 9.3), and would have incurred a substantial amount to comply with Contract Section H, paragraph 23.b (All Contractor-furnished equipment transferred to the Government shall be in good operating condition and well maintained). With all of these

additional costs, and the only offsetting income being the fixed monthly payments - adjusted to account for the CPI, it is not very likely that any pre-termination loss position would have been substantially reduced. The Contractor can not contend that it was in a loss position (did not recover its cost of the energy saving equipment) and at the same time contend that it was in a profit position (and entitled to profit). I am not convinced that the Contractor did not recover the cost associated with providing and installing the energy saving equipment, and instead I am convinced that the Contractor was in a "profit" position when the contract was terminated.

## CONCLUSIONS

52) Based upon the contract record and the facts before me; I conclude that it is in the best interest of the Government to limit the Government's liability associated with this contract and to establish a unilateral termination settlement amount for the subject contract.

53) To establish the pre-termination amount, I will accept the $14,318,422 that Mr. Freeman certified in his 20 June 2005 proposal for the cost incurred by the Contractor during the construction phase of the contract; I will also accept Mr. Freeman's proposed $762,536 for the associated cost of facilities capital; and will accept $22,714,888 as the cost incurred by the Contractor during the maintenance phase of the contract – for a subtotal amount of $37,795,846. I will further assume that the Contractor would have been in a profit position at the end of the contract, had the contract not been terminated for the convenience of the Government, so that a profit amount can be added to that subtotal. Based upon the alternate structured approach contained in EFARS 15.404, which resulted in estimating a profit factor of 8.075 percent, I will allow an amount of $3,052,015 for profit; resulting in a total pre-termination amount of $40,847,861.

54) I do not accept Mr. Freeman's proposed amount for the post-termination cost. I completely reject the proposed amounts for "Amortization of Initial Costs" and "Amortization of Operating Costs" contained in the first proposal; as well as the amounts for "Monthly Payments" and "Unamortized Asset Value" contained in the second proposal. Regarding the proposed amounts for "Termination Expenses" and "Termination Settlement Costs," I accept some of the proposed sub items and amounts - after removing the unallowable, unallocable, and unreasonable portions as summarized below:

a) Regarding the proposed Termination Expenses: The proposal contained 248 hours for Mr. Jones (one of CEG's owners) to supervise the demobilization efforts at the contract worksite; however, the DCAA determined that only161 hours had actually been incurred, I accept the findings of the DCAA and adjusted the proposed amounts for "George's" salary and payroll tax accordingly (see table below). I accept the amount shown on the contemporaneously signed material turn-over sheets, and reject the unsigned turn-over documents submitted within the proposal. I accept the proposed amount for transportation, completely reject the proposed "Loss" on the sale of the Contractor-owned vehicles, and made relatively minor adjustments to the remaining direct cost items by accepting the findings set forth in the TAR and the DCAA audit report. I do not accept the proposed CEG

EXHIBIT A

overhead rate, or its calculation; however, I must include an overhead rate for the Contractor (ACP). In the absence of contrary evidence, I have applied an arbitrary 60 percent mark-up for ACP's overhead. As reflected below, of the proposed $335,077 for termination expenses, I find that ACP is entitled to only $256,534.

**Termination Expenses**

| Item | Description | | 20-Dec-05 Amount | Accepted Amount |
|---|---|---|---|---|
| 1 | George - (Partner) | | $14,310 | $9,290 |
| 2 | Payroll Tax on George @ 12% | | $1,717 | $1,115 |
| 3 | Supplies (Material turned-over) | | $40,000 | $18,712 |
| 4 | Transportation (Hauling 3 Trailers) | | $10,000 | $10,000 |
| 5 | Loss on Trucks | | $18,000 | $0 |
| 6 | Severance Pay to Employees | | $106,543 | $100,116 |
| 7 | Payroll Tax on Severance pay @12% | | $12,785 | $12,114 |
| 8 | Health Benefits (etc.) | | $4,568 | $6,427 |
| 9 | Transportation of garbage | | $1,500 | $2,560 |
| 10 | | Subtotal = | $209,423 | $160,333 |
| 11 | Overhead @ 60% | | $125,654 | $96,200 |
| 12 | | Total = | $335,077 | $256,534 |

b) Regarding the proposed Termination Settlement Cost: The proposal purportedly submitted for ACP, contained amounts for three different individuals; one of CEG's Owners; a Consultant to CEG, and a Lawyer for CEG. The "Consulting" amount was purportedly associated with reviewing the ACP's cost records and ACP's accounting records to assemble ACP's Cost or Pricing Data and to prepare ACP's termination settlement proposal. I find that expending hours arguing with the TCO that the submission of Cost or Pricing Data was not required and then preparing a termination settlement proposal based upon payments not made, instead of incurred cost - is simply not reasonable. Based upon the additional hours identified by the DCAA, combined with a reduction of hours as recorded between 20 June 2005 (the date of the initial proposal) and 20 December 2005 (the date of the revised submission - 78 hours at $200/hour); and reducing the anticipated hours to negotiate the termination settlement from 98 hours to 30 hours; I further find that only $85,095 of the proposed $109,400 is allowable, allocable and reasonable for CEG's consultant. Similarly, I find that only $21,450 of the proposed $49,200 is allowable, allocable and reasonable for the CEG's lawyer. Based upon a similar reduction in the proposed hours for Mr. Freeman, and then increasing the number of hours to account for Mr. Jones' involvement, as identified by the DCAA, I find that only $26,449 of the proposed $27,731 is allowable, allocable and reasonable for Owners of CEG. As reflected below, of the proposed $186,331 for termination settlement costs, I find that ACP is entitled to $132,994.

**Termination Settlement Costs**

| Description | Proposed Amount | Accepted Amount |
|---|---|---|

EXHIBIT A

| | | |
|---|---|---|
| Consulting - Bill Lennett | $109,400 | $85,095 |
| Legal Expenses - Tim Power | $49,200 | $21,450 |
| Owner - Bob Freeman (plus) | $27,731 | $26,449 |
| Total = | $186,331 | $132,994 |

c) Based upon the above, I find that ACP is entitled to post termination cost of $389,528 consisting of $256,534 for termination expenses, and $132,994 for termination settlement costs. As reflected in the following table, the summation of the pre-termination and the post termination amounts results in a final contract price of $41,237,389.

| **Pre-Termination Cost** | | | **Amount** |
|---|---|---|---|
| Construction Phase Cost | | | $14,318,422 |
| Cost of Facilities Capital | | | $762,536 |
| O&M Phase Cost | | | $22,714,888 |
| | Subtotal = | | $37,795,846 |
| Profit (Fee) | | 8.075% | $3,052,015 |
| | Subtotal = | | $40,847,861 |
| **Post Termination Cost** | | | |
| Termination Expenses | | | $256,534 |
| Settlement Cost | | | $132,994 |
| | Subtotal = | | $389,528 |
| **Final Contract Amount** | | | |
| Pre-Termination Cost | | | $40,847,861 |
| Post Termination Cost | | | $389,528 |
| | Subtotal = | | $41,237,389 |
| **Previous Payments** | | | |
| Pre-Termination Payments | | | $46,379,724 |
| Partial Termination Payments | | | $1,072,668 |
| | Subtotal = | | $47,452,392 |
| **Amount Owed to Contractor** | | | |
| or (Owed by Contractor) | | | |
| Final Contract Amount | | | $41,237,389 |
| less payment already made | | | $47,452,392 |
| | Subtotal = | | ($6,215,003) |

EXHIBIT A

## DECISION

55) Based on the Findings of Fact and Conclusions set forth above, I hereby determine that the final contract price, as a result of the termination for the convenience of the Government, should be established at $41,237,389. I further determine that since the Contractor has already received $47,452,392 in payments under the contract; that the Contractor will need to repay the Government the excess payment amount of $6,215,003. A contract modification will be issued formally establishing this amount as the final contract price, as a result of terminating the contract for the convenience of the Government, and will require that the Contractor pay the Government the sum of $6,215,003, plus interest.

56) The Appeal Procedure paragraph that follows is required to be included in this final decision.

## APPEAL PROCEDURE

This is the final decision of the contracting officer. You may appeal this decision to the Armed Services Board of Contract Appeals, Skyline Six, 5109 Leesburg Pike, 7th Floor, Falls Church, Virginia, 22041. If you decide to appeal, you must, within ninety (90) days from the date you receive this decision, mail or otherwise furnish written notice to the Armed Services Board of Contract Appeals and provide a copy to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended, refer to this decision, and identify the contract by number. Instead of appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the United States Court of Federal Claims, 717 Madison Place, N.W., Washington, D.C. 20005, within twelve (12) months of the date you receive this decision. If you appeal to the Armed Services Board of Contract Appeals, you may, solely at your election, proceed under the Board's small claims procedure for claims of $50,000 or less or its accelerated procedures for claims of $100,000 or less.

Date 31 October 2006

David Y. Kam
David Y. Kam
Termination Contracting Officer

EXHIBIT A