**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ALIAMANU CONSERVATION PARTNERS, INC. | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 07-134-C (Judge Braden) |
| THE UNITED STATES | ) | |
| Defendant. | ) | |

**MOTION OF ALIAMANU CONSERVATION PARTNERS PURSUANT TO RCFC 56 FOR SUMMARY JUDGMENT DISMISSING DEFENDANT'S CROSS COMPLAINT**

This Motion is respectfully submitted by Plaintiff Aliamanu Conservation Partners (ACP) in support of its motion, pursuant to RCFC 56, for summary judgment dismissing Defendant's counter claim.

In support of this Motion, ACP relies on the following submitted herewith:

1. The Proposed Findings of Uncontroverted Facts of ACP;
2. The Memorandum of Law of ACP in support of its motion for summary judgment dismissing Defendant's counterclaim;
3. The Appendix containing Exhibits 1 through 16.

WHEREFORE, ACP respectfully requests that the Court grant its motion for summary judgment dismissing Defendant's counter claim.

Respectfully Submitted,

s/ Timothy H. Power
Timothy H. Power
19229 Sonoma Highway
Sonoma, CA 95476
Tel: (707) 343-1550
Fax: (707) 343-1552

Attorney for Plaintiff
Aliamanu Conservation Partners

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ALIAMANU CONSERVATION PARTNERS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-134-C |
| | ) | (Judge Braden) |
| THE UNITED STATES | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

LEGAL MEMORANDUM IN SUPPORT
OF MOTION FOR SUMMARY JUDGEMENT

TABLE OF CONTENTS

MEMORANDUM OF LAW 1

STATEMENT OF QUESTIONS PRESENTED 1

STATEMENT OF FACTS 1

LEGAL ARGUMENT 6

1. Unconditional Acceptance of Work Can Only Be Voided or Rejected for Latent Defects, Fraud, or Gross Mistakes Amounting to Fraud 6

2. The Government Unconditionally Accepted the Installation of the Energy Conservation Equipment, the Additional Work Added by Various Modifications, and the Line Item Work Added by Modification P00100. 10

3. The Defendant Has Not Alleged Any Basis for Voiding the Acceptance of Plaintiff's Work. 11

CONCLUSION 13

TABLE OF AUTHORITIES

*Decker & Co. v. Togo D. West, Jr., Secretary of the Army*
76 F.3d 1573 (Fed. Cir. 1996) passim

*United Technologies Corporation, Sikorsky Aircraft Division*
*v. The United States*
27 Fed. Cl. 393 (COFC 1992). 7

**MEMORANDUM OF LAW IN SUPPORT OF ALIAMANU CONSERVATION PARTNERS MOTION FOR SUMMARY JUDGMENT DISMISSING DEFENDANT'S COUNTER CLAIM**

This Memorandum of Law is respectfully submitted by Aliamanu Conservation Partners (ACP) in support of its motion, pursuant to RCFC, for summary judgment dismissing Defendant's counter claim.

The Motion of ACP and this Memorandum of Law for summary judgment is accompanied by the following on which it relies:

1. Appendix, containing Exhibits 1 through 16
2. The Proposed Findings of Uncontroverted Facts of ACP.

**STATEMENT OF QUESTIONS PRESENTED**

Whether Defendant can void its unconditional acceptance of Plaintiff's work and payment at the original contract price after as long as 13 years in order to reprice the accepted contract work and allege a counterclaim based on an overpayment of the new contract price.

**STATEMENT OF FACTS**

On February 11, 1991 the United States Army Engineers, Huntsville, Alabama awarded Contract No. DACA87-91-C-0019 to Co-Energy Group. App. Pg. 1[1] The purpose of the contract was to "engage a contractor who will provide equipment and services at Aliamanu Military Reservation (AMR) family housing complex, Honolulu, Hawaii that shall result in a reduction in the energy expenditure." App. Pg.4 The AMR family housing complex contained 1510 townhouse units and 1090 apartment units at the time of award. App. pg. 4

[1] The contract was novated from CEG to CEGALI corporation and then to Aliamanu Conservation Partners. Exhibit A to Answer, pg. 3, para. 8.

The Contract required, as a minimum, the replacement of existing air conditioning and cooling equipment in the family housing units App. Pg, 5. The services and equipment used to reduce energy consumption and maintenance expenditures were provided by the contractor at its own expense. In return for this expenditure, the government promised to pay the contractor a portion of the government's avoided energy and maintenance expenditures for the term of the contract. App. Pg 4.

After installation and Government acceptance of the energy savings equipment the Government paid the contractor for its portion of the energy and maintenance savings. App. Pg 7. Acceptance of the installation of the energy savings equipment was made on a joint final inspection of individual housing units. App. Pgs. 9-10. All construction was completed in July 1993. A punch list on the completion of the installation of all equipment was issued by the government on May 18, 1993 (App. Pg 12) and was corrected by Plaintiff and submitted to the Government on July 6, 1993. App. Pgs.14-17.

The total contract term was 15 years. App. Pg. 19. After completion and acceptance of the energy savings equipment payments were calculated each month for the remaining term of the contract. Complaint and Answer para. 22.

In 1998 the parties negotiated Modification P00100, effective June 1, 1996 . This modification included an agreed upon monthly energy savings and also added three new payment items to the contract. These were: replace electric hot water heater during normal working hours, replace electric hot water heater for first floor apartment units after regular working hours, and replace electric hot water heaters for 2nd and 3rd floor apartment units after regular working hours. App. Pgs. 21-23.

During performance the government executed bi-lateral modifications to the contract to add additional construction work. The parties negotiated the price for each item of work performed under these modifications. App. Pgs 25-28.

After the execution of Modification P00100 there were three items that could be included in Plaintiff's monthly invoice: (1) the amount of energy and maintenance savings achieved that month, (2) additional construction work performed that month under a modification, and (3) any of the three fixed-price line items from Modification P00100 ordered by the government that month

The following process was used to make payment. Plaintiff would submit an invoice each month for energy and maintenance savings and would also include any additional work at the agreed upon price and any fixed-price line item work performed. App. Pg. 30. The Contracting Officer's Representative (COR) would review the invoice and make his own independent corrections. App. Pg. 30.

An Army Corps of Engineers standard ENG Form 93 entitled "PAYMENT ESTIMATE-CONTRACT PERFORMANCE" was executed for each invoice. This form listed the period of performance covered, the work performed, the contract unit price, the amount for the work, and the total amount for each work item. App. Pg. 32, 34.

ENG Form 93 included a box entitled "APPROVAL FOR PAYMENT". In this box each ENG Form 93 included the following certification:

> I certify that I have checked the quantities covered by this bill or estimate; that the work was actually performed; that the quantities are correct and consistent with all previous computations as actually checked; that the quantities and amounts are wholly consistent with the requirements of the contract or other instrument involved.

This certification was signed by a civil engineering technician and approved by the Contracting Officer's Representative. App. Pg. 32, 34.

The completed ENG Form 93 was sent to the financial office and payment was made based upon the ENG Form 93 approval. App. Pgs. 34-36.

The contract included clause E.1 entitled "INSPECTION OF CONSTRUCTION", Federal Acquisition Regulation (FAR) clause 52.246-12. That clause provides in paragraph (I):

> Unless otherwise specified in the contract. The Government shall accept, as promptly as practicable after completion and acceptance, all work required by the contract or that portion of the work the Contracting Officer determines can be accepted separately. Acceptance shall be final and conclusive except for latent defects, fraud, gross mistakes amounting to fraud, or the Government's rights under any warrants or guarantees. App. Pgs. 38-39.

Every payment made to Plaintiff was certified as accepted on an ENG Form 93 prior to payment. App. Pgs. 41- 46.

The government has not alleged that it voided acceptance based on latent defects, fraud, gross mistakes amounting to fraud, nor any right under any warranty or guarantee relating to the work accepted by the government.

On August 12, 2004 the contracting officer notified the plaintiff that the Contract was being terminated for the convenience of the government with an effective termination date of September 30, 2004. Exhibit A to Answer, pg. 1, para. 1.

Plaintiff claimed it was entitled to all the contract payments already received plus settlement costs and termination costs, as well as the remaining monthly payments through the 15 year term of the contract. Exhibit A to Answer, pg. 1, para. 2. The contracting officer

rejected payment of the remaining contract payments and determined that the contract price, the amount to be paid to Plaintiff, should be based upon the costs of performance incurred prior to the termination of the contract .Exhibit A to Answer, pg. 1, para. 2. On June 20, 2005 Plaintiff submitted a settlement proposal based upon the total cost method as directed by the contracting officer. Exhibit A to Answer, pg. 7, para.15.

The parties were not able to agree upon a settlement based upon the total cost method. For several months the parties disagreed upon the need for cost or pricing data to support the settlement proposal. The Contracting Officer's Final Decision chronicles the problems the parties had over the next few months. Exhibit A to Answer, pgs. 8-9, paras. 17-21.

On October 31, 2005 ACP submitted a revised settlement proposal in the amount of $7,641,772 based upon its original position that the contractor was owed the remaining monthly payments through the 15 year term of the contract because it had completed the installation of the energy savings equipment. Exhibit A to Answer, pgs. 9-10 , paras. 22-23.

In the Price Objective Memorandum (POM) prepared by the Contracting Officer on September 18, 2006 he determined that the Plaintiff had been overpaid during performance. He determined that the difference between what Plaintiff was paid and what he determined to be the amount owing Plaintiff on a cost basis was that Plaintiff owed the Government $683,140. App. Pg. 70.

The Price Negotiation Memorandum records that the Government Negotiator arrived at a proposed settlement amount that was overpaid to Plaintiff in the amount of $6,221,395 rather than the $683,140 established in the POM. App. Pg. 76. When this amount was rejected by Plaintiff, the Contracting Officer offered to settle for a lesser amount of $683,140. App. Pg. 76.

Plaintiff rejected the alternate offer. App. Pg 77.

After the parties were not able to reach settlement the Contracting Officer issued a decision making a unilateral termination settlement of the contract. In that decision he asserted a government claim to $6,215,003 for the alleged overpayment. Exhibit A to Answer pg. 23.

The Modification incorporating the new contract price established by the Contracting Officer's Final Termination Decision, states:

> The Contractor has already received monthly payments totaling $46,379,724 for work and services performed, or items delivered, under the completed portion of the contract. The Government confirms the right of the Contractor . . . to retain only $41, 237,389 of this amount as the amount for which the Contractor is entitled in complete and final settlement of the contract. Exhibit B to Answer pg. 3 of 5.

## LEGAL ARGUMENT

1. .Unconditional Acceptance of Work Can Only Be Voided or Rejected for Latent Defects, Fraud, or Gross Mistakes Amounting to Fraud

It has long been held that when the government unconditionally accepts work performed on a contract that such work and payment for the work in final and conclusive, except for latent defects, fraud, or gross mistakes amounting to fraud. *Decker & Co. v. Togo D. West, Jr., Secretary of the Army* ; 76 F.3d 1573 (Fed. Cir. 1996) ; *United Technologies Corporation, Sikorsky Aircraft Division v. The United States* ; 27 Fed. Cl. 393 (COFC 1992).

In *United Technologies* the government alleged in a counterclaim that helicopter spindles delivered as part of the production of Blackhawk helicopters were defective. The helicopters were manufactured under a fixed price incentive fee contract. The contract included the standard fixed price incentive supply contract inspection clause which provides:

> All supplies shall be subject to inspection and test by the Government . . . [and] in case any supplies or lots of supplies are defective in material or workmanship or otherwise not in conformity with the requirements of this contract, the Government shall have the right either to reject them . . . or to require their correction . . . .
>
> Except as otherwise provided in this contract, acceptance shall be conclusive except as regards latent defects, fraud, or such gross mistakes as amount to fraud. *United Technologies* at 395-396.

The government admitted it accepted the spindles. In order to avoid the finality of acceptance of the spindles the government alleged there was a latent defect in the spindles. In addressing this allegation the Court said:

> A latent defect negates the effect of final acceptance under a contract. *Kaminer Constr. Corp. v. United States*, 203 Ct. Cl. 182, 488 F.2d 980 (1973). In order for the government to avoid the conclusive effect of final acceptance of the spindles,
>
> > 'it must establish the existence of defects at the time of final acceptance which were hidden from knowledge as well as sight and could not be discovered by the exercise of reasonable care.' *United Technologies* at 398.

Four years later the Court of Appeals for the Federal Circuit issued a decision finding that when the government accepts work required under the contract that acceptance is final and conclusive at the time of acceptance. It cannot be voided by later events, except under specific circumstances. *Decker, supra.* at 1582.

*Decker* involved a construction contract to renovate military barracks. Decker fell behind on the construction schedule and on August 3, 1988 the government terminated its contract for default.

On November 12, 1988 Decker submitted an invoice for the work it completed on the contract. On January 11, 1989 a representative of Decker, a government inspector and the Contracting Officer's Representative made an on-site inspection to determine the percentage of

completion of the items listed on the invoice. The next day, January 12, 1989, Decker submitted a revised invoice that reflected the percentage of completion agreed to by the parties on January 11, 1989.

On January 31, 1989 the Contracting Officer sent a preliminary assessment of liquidated damages to the finance office, requested that the liquidated damages be subtracted from the amount of the invoice, and pay the balance to Decker. Between January 31, 1989 and February 23, 1989 the government conducted an investigation which discovered that discrepancies existed between the amounts on the invoice and the actual amount of completed work. On April 14, 1989 another Contracting Officer approved payment of the invoice, less the liquidated damages and a further deduction for items which the government did not receive because of the incorrect percentage of completion.

In response to Decker's contention that the Contracting Officer already had inspected and accepted the work and authorized payment (subject to reduction for liquidated damages) before it made the deductions, and that such acceptance was final and conclusive under the terms of the contract, the Court found:

> Both as a matter of contract and as a principle of law, once the Government accepts the work required under the contract, that acceptance is binding on the parties. See *Sentell Bros., Inc.*, DOTCAB No. 1824, 89-3 BCA 21,904 (1989); *Ahern Painting Contractors, Inc.*, GSBCA Nos. 7912, 8368, 90-1 BCA 22,291 (1989). The contract contained an "Inspection of Construction" clause, pursuant to FAR § 52.246-12, that stated in pertinent part:
>
> > '(I) Unless otherwise specified in the contract, the Government shall accept, as promptly as practicable after completion and inspection, all work required by the contract or that portion of the work the Contracting Officer determines can be accepted separately. Acceptance shall be final and conclusive except for latent defects, fraud, gross mistakes amounting to fraud, or the Government's rights under any warranty or guarantee.'

> 48 C.F.R. § 52.246-12(I) (1994). As a matter of general principle, finality in contract relations is important not only in light of the parties' expectations, but as a matter of economic efficiency. Uncertainty has real costs, and it is in the interest of both the contractor and the Government to be able to rely on decisions fairly made. *Decker, supra* at 1582.

The Court then ruled that under the terms of the contract acceptance was final and conclusive except for latent defects, fraud, gross mistakes amounting to fraud, or the Government's rights under any warranty or guarantee. *Decker* at 1583. With regard to the deductions made after the Contracting Officer's acceptance on January 31, 1989 the Court concluded: "that the deductions were made after final acceptance by the CO, and the Army has not proven circumstances sufficient to void that acceptance." *Decker* at 1584.

The contract in this case includes the same Inspection and Acceptance clause with the same provision that "Acceptance shall be final and conclusive except for latent defects, fraud, gross mistakes amounting to fraud, or the Government's rights under any warranty or guarantee."

Therefore, after the government accepted work, that acceptance was final and conclusive and could not be voided or rejected even if the government later discovered what it considered to be an overpayment for the items or services, unless the overpayment was the result of a latent defect, fraud or gross mistake amounting to fraud.

2. The Government Unconditionally Accepted the Installation of the Energy Conservation Equipment, the Additional Work Added by Various Modifications, and the Line Item Work Added by Modification P00100.

*Decker* ruled that whether the Government accepted the work and authorized payment on it before deducting amounts from Decker's invoice is a fact question. *Decker* at 1582. The Court considered the following facts in concluding that there was acceptance: (1) there was a joint inspection of the work by the parties and they agreed upon the percentage of completion of the items

on Decker's invoice; (2) the invoice was revised to match the agreed upon percentage of completion; (3) the revised invoice was resubmitted to the government; (4) the next page in the record was a certification by the Contracting Officer's Representative and Government Inspector that "the services called for in this invoice have been rendered in accordance with the terms of the contract and the specification governing same," and a notation for "Partial Payment"; (5) Contracting Officer added a notation to the invoice that payment of the invoice should be made less assessed liquidated damages; (6) the Contracting Officer sent the annotated invoice to the finance office with a request that the invoice less liquidated damages be paid to Decker. *Decker* at 1582-1583.

In the instant case: (1) the parties conducted a joint final inspection of each housing unit where energy savings equipment was installed and agreed that there were no deficiencies; (2) based upon this acceptance the Government began making payments for energy and maintenance savings; (3) each month Plaintiff submitted an invoice for the energy and maintenance savings payment and any additional work performed that month; (4) the Contracting Officer's Representative made any corrections to the invoice he felt were appropriate; (5) a Government inspector and the COR signed an ENG 93 form that listed the period of performance covered, the work performed, the contract unit price, the amount for the work, and the total amount for each work item, certification that the work was completed and an approval for payment;[2] and (6) payment was made based upon the ENG

[2] ENG Form 93 included a box entitled "APPROVAL FOR PAYMENT". In this box each ENG Form 93 included the following certification:

> I certify that I have checked the quantities covered by this bill or estimate; that the work was actually performed; that the quantities are correct and consistent with all previous computations as actually checked; that the quantities and amounts are wholly consistent with the requirements of the contract or other instrument involved.

93 form because the COR was authorized to accept Plaintiff's work. Every payment made to Plaintiff was based upon a completed ENG 93 form.

The significant differences in the facts in *Decker* and the instant case is the period of time between acceptance of the work and the time of the attempted voiding of the acceptance. In *Decker* the time between acceptance and the attempt to void acceptance was from January 31, 1989 and April 14, 1989. In the instant case the time between acceptance and the attempt to avoid acceptance is as long as 15 years.

3. The Defendant Has Not Alleged Any Basis for Voiding the Acceptance of Plaintiff's Work

Defendant has not alleged that there was anything defective about Plaintiff's work or that the amounts were incorrect in any way. In fact, payment was based upon the independent evaluation by the Contracting Officers Representative of the amount and quality of Plaintiff's performance. Therefore, Defendant's attempt to void the acceptance of Plaintiff's performance and replace it with a new price has no justification.

Defendant's basis for ignoring the acceptance and payment at the contract price for 15 years is the fact that the contract was terminated for the convenience of the Government.

Apparently the Contracting Officer and the Contracting Officer's Technical Representative believed that any contract termination settlement should be based upon a total cost basis. Although Plaintiff's initial position was that settlement should be based upon payment of the energy and maintenance savings received by the Government for the remaining original term of the contract. The Contracting Officer determined that a settlement would be based upon pre-termination costs and not work completed and accepted.

Plaintiff initially attempted to comply with the Contracting Officer's direction and submitted a termination settlement proposal based upon costs. Thereafter Plaintiff and the Contracting Officer could not agree on what constituted cost or pricing data needed to support Plaintiff's proposal or if Plaintiff had to submit it. Discussions lasted for months on these subjects with no resolution. Plaintiff had difficulty responding to some of the Contracting Officer's requests because the cost records requested were almost 20 years old.

Plaintiff went back to its original position that payment should be made for completed work and that it should receive its share of the energy and maintenance savings the Government would realize from the date of termination to the original date for expiration of the contract. The Contracting Officer continued to request cost data. The Contracting Officer and his Technical Representative ignored Plaintiff's settlement proposal based upon payment for completed work. Ultimately the Contracting Officer determined his estimate of Plaintiff's performance costs, added what he considered a reasonable profit, and came up with a new contract price. He then took the difference between what Plaintiff was paid and this new contract price to calculate an amount due from Plaintiff to the Government. In doing so he had to void the payments previously made for accepted performance.

The Modification incorporating the new contract price established by the Contracting Officer's Final Termination Decision, states:

> The Contractor has already received monthly payments totaling $46,379,724 for work and services performed, or items delivered, under the completed portion of the contract. The Government confirms the right of the Contractor . . . to retain only $41, 237,389 of this amount as the amount for which the Contractor is entitled in complete and final settlement of the contract.

Defendant's counterclaim is based upon voiding the acceptance and payment for the

completed work and performance, retroactively reducing the price for the work performed, then claiming that the Plaintiff owes the Government the difference between the amount paid monthly for accepted work over 15 years and the new reduced contract price.[3]

## CONCLUSION

In this case the long period of contract performance, the government's attempt to change the basis for payment to a cost basis after 15 years, and the difficulties of searching through years of accounting records to meet the Contracting Officer's demand for cost or pricing data in this case underscores *Decker's* observation on the need for finality.

> As a matter of general principle, finality in contract relations is important not only in light of the parties' expectations, but as a matter of economic efficiency. Uncertainty has real costs, and it is in the interest of both the contractor and the Government to be able to rely on decisions fairly made. *Decker, supra* at 1582.

Without claiming that there was anything wrong with the original acceptance and payment the Contracting Officer determined that Plaintiff was not entitled to payment for the performance that was accepted and paid for years before. This is in direct violation of the settled law that acceptance and payment is final and conclusive except for latent defects, fraud, or gross mistake amounting to fraud.

---

[3]The development of the amount of the government's counterclaim shows that it is an arbitrary number inexplicably chosen and used to coerce ACP into accepting a settlement as shown by government prepared documents. The Price Objective Memorandum prepared by the Contracting Officer's Technical Representative dated September 18, 2006 concludes that ACP was overpaid by $683,140. There is no mention of $6,215,003, the amount of the counterclaim. However, when the government negotiated with ACP two weeks later on October 5, 2006 the Contracting Officer claimed that ACP owed the government $6,215,003. Price Negotiation Memorandum. There is no explanation why the Contracting Officer increased the claimed overpayment by almost tenfold.

Defendant's counterclaim should be dismissed.

Respectfully submitted

<u>s/ Timothy H. Power</u>
Timothy H. Power
Attorney for Aliamanu
Conservation Partners

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| ALIAMANU CONSERVATION PARTNERS, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES<br><br>Defendant. | No. 07-134-C<br>(Judge Braden) |

**PLAINTIFF ALIAMANU CONSERVATION PARTNERS PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Pursuant to Rule 56 of the rules of this Court, Plaintiff, Aliamanu Conservation Partners (ACP) respectfully submits these proposed findings of uncontroverted facts.

1. On February 11, 1991 the United States Army Engineers, Huntsville, Alabama awarded Contract No. DACA87-91-C-0019 to Co-Energy Group. App. Pg. 1[4]

2. The purpose of the contract was to "engage a contractor who will provide equipment and services at Aliamanu Military Reservation (AMR) family housing complex, Honolulu, Hawaii that shall result in a reduction in the energy expenditure." App. Pg.4 The AMR family housing complex contained 1510 townhouse units and 1090 apartment units at the time of award. App. pg. 4

3. The Contract required, as a minimum, the replacement of existing air conditioning and cooling equipment in the family housing units App. Pg, 5.

4. The services and equipment used to reduce energy consumption and maintenance expenditures were provided by the contractor at its own expense. In return for this expenditure, the

[4] The contract was novated from CEG to CEGALI corporation and then to Aliamanu Conservation Partners. Exhibit A to Answer, pg. 3, para. 8.

government promised to pay the contractor a portion of the government's avoided energy and maintenance expenditures for the term of the contract. App. Pg 4.

5. After installation and Government acceptance of the energy savings equipment the Government paid the contractor for its portion of the energy and maintenance savings. App. Pg 7. Acceptance of the installation of the energy savings equipment was made on a joint final inspection of individual housing units. App. Pgs. 9-10. All construction was completed in July 1993. A punch list on the completion of the installation of all equipment was issued by the government on May 18, 1993 (App. Pg 12) and was corrected by Plaintiff and submitted to the Government on July 6, 1993. App. Pgs.14-17.

6. The total contract term was 15 years. App. Pg. 19. After completion and acceptance of the energy savings equipment payments were calculated each month for the remaining term of the contract. Complaint and Answer para. 22.

7. In 1998 the parties negotiated Modification P00100, effective June 1, 1996 . This modification included an agreed upon monthly energy savings and also added three new payment items to the contract. These were: replace electric hot water heater during normal working hours, replace electric hot water heater for first floor apartment units after regular working hours, and replace electric hot water heaters for 2nd and 3rd floor apartment units after regular working hours. App. Pgs. 21-23.

8. During performance the government executed bi-lateral modifications to the contract to add additional construction work. The parties negotiated the price for each item of work performed under these modifications. App. Pgs 25-28.

9. After the execution of Modification P00100 there were three items that could be included in Plaintiff's monthly invoice: (1) the amount of energy and maintenance savings achieved that

month, (2) additional construction work performed that month under a modification, and (3) any of the three fixed-price line items from Modification P00100 ordered by the government that month.

10. The following process was used to make payment. Plaintiff would submit an invoice each month for energy and maintenance savings and would also include any additional work at the agreed upon price and any fixed-price line item work performed. App. Pg. 30. The Contracting Officer's Representative (COR) would review the invoice and make his own independent corrections. App. Pg. 30.

11. An Army Corps of Engineers standard ENG Form 93 entitled "PAYMENT ESTIMATE-CONTRACT PERFORMANCE" was executed for each invoice. This form listed the period of performance covered, the work performed, the contract unit price, the amount for the work, and the total amount for each work item. App. Pg. 32, 34.

12. ENG Form 93 included a box entitled "APPROVAL FOR PAYMENT". In this box each ENG Form 93 included the following certification:

> I certify that I have checked the quantities covered by this bill or estimate; that the work was actually performed; that the quantities are correct and consistent with all previous computations as actually checked; that the quantities and amounts are wholly consistent with the requirements of the contract or other instrument involved.

13. This certification was signed by a civil engineering technician and approved by the Contracting Officer's Representative. App. Pg. 32, 34.

14. The completed ENG Form 93 was sent to the financial office and payment was made based upon the ENG Form 93 approval. App. Pgs. 34-36.

15. The contract included clause E.1 entitled "INSPECTION OF CONSTRUCTION", Federal Acquisition Regulation (FAR) clause 52.246-12. That clause provides in paragraph (I):

> Unless otherwise specified in the contract. The Government shall accept, as promptly as practicable after completion and acceptance, all work required by the contract or that portion of the work the Contracting Officer determines can be accepted separately. Acceptance shall be final and conclusive except for latent defects, fraud, gross mistakes amounting to fraud, or the Government's rights under any warrants or guarantees. App. Pgs. 38-39.

16. After completion and acceptance of the energy savings equipment , monthly payments were calculated each month for the remaining term of the contract. Complaint and Answer paragraph 22.

17. Every payment made to Plaintiff was certified as accepted on an ENG Form 93 prior to payment. App. Pgs41- 46.

18. The government has not alleged latent defects, fraud, gross mistakes amounting to fraud, nor any right under any warranty or guarantee relating to the work accepted by the government.

19. On August 12, 2004 the contracting officer notified the plaintiff that the Contract was being terminated for the convenience of the government with an effective termination date of September 30, 2004. Exhibit A to Answer, pg. 1, para. 1.

20. Plaintiff claimed it was entitled to all the contract payments already received plus settlement costs and termination costs, as well as the remaining monthly payments through the 15 year term of the contract. Exhibit A to Answer, pg. 1, para. 2.

21. The contracting officer rejected payment of the remaining contract payments and determined that the contract price, amount to be paid to Plaintiff, should be based upon the costs of performance incurred prior to the termination of the contract .Exhibit A to Answer, pg. 1, para. 2.

22. On June 20, 2005 Plaintiff submitted a settlement proposal based upon the total cost method as directed by the contracting officer. Exhibit A to Answer, pg. 7, para.15.

23. The parties were not able to agree upon a settlement based upon the total cost method.

For several months the parties disagreed upon the need for cost or pricing data to support the settlement proposal. The Contracting Officer's Final Decision chronicles the problems the parties had over the next few months. Exhibit A to Answer, pgs. 8-9, paras. 17-21.

24. On October 31, 2005 ACP submitted a revised settlement proposal in the amount of $7,641,772 based upon its original position that the contractor was owed the remaining monthly payments through the 15 year term of the contract because it had completed the installation of the energy savings equipment. Exhibit A to Answer, pgs. 9-10 , paras. 22-23.

26. In the Price Objective Memorandum (POM) prepared by the Contracting Officer on September 18, 2006 he determined that the Plaintiff had been overpaid during performance. He determined that the difference between what Plaintiff was paid and what he determined to be the amount owing Plaintiff on a cost basis was that Plaintiff owed the Government $683,140. App. Pg. 70.

27. The Price Negotiation Memorandum records that the Government Negotiator arrived at a proposed settlement amount that was overpaid to Plaintiff in the amount of $6,221,395 rather than the $683,140 established in the POM. App. Pg. 76. When this amount was rejected by Plaintiff, the Contracting Officer offered to settle for a lesser amount of $683,140. App. Pg. 76. Plaintiff rejected the alternate offer. App. Pg 77.

28. After the parties were not able to reach settlement the Contracting Officer issued a decision making a unilateral termination settlement of the contract. In that decision he asserted a government claim to $6,215,003 for the alleged overpayment. Exhibit A to Answer pg. 23.

29. The Modification incorporating the new contract price established by the Contracting Officer's Final Termination Decision, states:

> The Contractor has already received monthly payments totaling $46,379,724 for work and services performed, or items delivered, under the completed portion of

the contract. The Government confirms the right of the Contractor . . . to retain only $41, 237,389 of this amount as the amount for which the Contractor is entitled in complete and final settlement of the contract. Exhibit B to Answer pg. 3 of 5.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

ALIAMANU CONSERVATION PARTNERS, INC.

Plaintiff,

v.

THE UNITED STATES

Defendant.

No. 07-134-C
(Judge Braden)

# APPENDIX

Timothy H. Power
19229 Sonoma Highway
PMB 246
Sonoma, CA 95476
Tel: (707) 343-1550
Fax: (707) 343-1552

Attorney for Aliamanu Conservation Partners

TABLE OF CONTENTS


| | Pages |
|---|---|
| Exhibit 1 Contract Award | 00001 - 00002 |
| Exhibit 2 Section C of Contract | 00003 - 00005 |
| Exhibit 3 Section E of Contract | 00006 - 00007 |
| Exhibit 4 Typical Final Inspections of Installed Equipment | 00008 - 00010 |
| Exhibit 5 Government Punch List of Remaining Work | 00011 - 00012 |
| Exhibit 6 Correction of Punch List | 00013 - 00017 |
| Exhibit 7 Clause F.3 of Contract | 00018 - 00019 |
| Exhibit 8 Modification P00100 | 00020 - 00023 |
| Exhibit 9 Typical Modifications Adding Work | 00024 - 00028 |
| Exhibit 10 Typical Invoice Corrected by COR | 00029 - 00030 |
| Exhibit 11 Typical ENG Form 93 | 00031 - 00032 |
| Exhibit 12 Typical Payment Based On ENG Form 93 | 00033 - 00036 |
| Exhibit 13 Inspection of Construction Clause | 00037 - 00039 |
| Exhibit 14 Attestation of Contract Payments | 00040 - 00046 |
| Exhibit 15 Price Objective Memorandum | 00047 - 00070 |
| Exhibit 16 Price Negotiation Memorandum | 00071 - 00079 |