CETAC-EC-TC (415-10c) 18 September 2006

PRICE OBJECTIVE MEMORANDUM - FAR 15.406-1

SUBJECT: Contract No. DACA87-91-C-0019, Shared Energy Savings Program, Aliamanu Family Housing Area, Oahu, Hawaii; Change Item No. A91019-224, "Termination for the Convenience of the Government"

1) Description of Acquisition:

This contract action involves the establishment of a modified and final contract price resulting from the termination for convenience (T4C) issued on 12 August 2004 with an effective date of 30 September 2004. The modified contract amount will include compensation for all work performed under the contract, as well as all incurred allowable, allocable, and reasonable post termination costs resulting from the T4C.

2) Background:

a) Contract No. DACA87-91-C-0019, Shared Energy Savings Program, Aliamanu Family Housing Area, Oahu, Hawaii required the Contractor to provide energy savings equipment and services at the Aliamanu Military Reservation (AMR) family housing complex in Honolulu, Hawaii, that would result in a reduction to the AMR energy expenditure. The equipment and services were to be provided by the Contractor, at the Contractor's expense, and the only payments that the Contractor would receive were to be based upon a pre-established percentage of the avoided energy and maintenance expenditures over a maximum term of fifteen (15) years[1], with a limitation that the amount paid for maintenance savings could not exceed the amount paid for the energy savings. The AMR family housing complex consisted of 1,510 town house units, 1,090 apartment units, and support facilities including a Recreational Center with a swimming pool, a Shopette/Gas Station, a Burger King, a Chapel Annex, and Athletic Fields. The energy expenditure at AMR was to be reduced through the implementation of Contractor developed and proposed Energy Conversation Projects (ECP's), subject to the acceptance of the Contracting Officer. Since air conditioning was the largest energy consumption system at AMR, the Contractor was required to develop an ECP to modify or replace the existing air conditioning system, and the Contractor was required to investigate potential ECP's involving the replacement of the interior and exterior incandescent bulbs with fluorescent bulbs and improving attic ventilation.

b) The Contract was awarded to Co-Energy Group (CEG) on 11 February 1991 (see Standard Form 25 executed by the Procurement Contracting Officer (PCO), Mr. James W. Reynolds). At the time of award, CEG certified that it was a California Corporation, was **not** a Small Business, its Tax Payer Identification Number (TIN) was 95-3930946, that its President was Mr. Robert Freeman, its Executive Vice President was Mr. Thomas Mitchell, and its Vice President was Mr. George Jones.

[1] The contract clearly stated a "maximum" duration, implying that the contract duration could be less than the stated maximum. To date, the undersigned has not been able to locate a contract provision that explicitly sets-forth a minimum duration for the contract.

c) Approximately eighteen (18) months after award of the contract, based upon CEG's written request, on 3 September 1992 the contract was novated from CEG to Cegali, Inc. (Cegali) by modification number P00009. At the time of the novation, CEG represented that Cegali was wholly owned by CEG; and Cegali represented that it was a California Corporation and that its President was Mr. Robert Freeman.

d) Approximately three (3) years later, based upon Cegali's written request, on 23 March 1995 the contract was again novated from Cegali, Inc. to the Aliamanu Conversation Partners L.P. (ACP) by modification number P00035. At the time of this novation, ACP was represented as being a Limited Partnership established in Hawaii, with Cegali, Inc. (California) being its General Partner.

e) By modification number P00212 dated 12 August 2004, the Termination Contracting Officer (TCO) notified ACP that the contract was being terminated for the convenience of the Government, effective as of 30 September 2004, and requested that ACP provide its termination settlement proposal within one year from the effective date of the termination.

f) Subsequent to the termination, the Contractor referring to the required settlement proposal forms identified in Federal Acquisition Regulation (FAR) Part 49.602, as well as the provision contained at FAR 49.206-1; indicated that the forms did not appear to be appropriate for this particular contract, and requested that the TCO waive the requirement for these forms. As a result of this request, the TCO informed the Contractor that it was more important for the Contractor to provide complete, current and accurate information, so that a termination settlement amount could be established, than using any particular termination settlement form.

g) As addressed in greater detail elsewhere in this document, the Contractor later provided a settlement proposal, and although the TCO repeatedly requested that the Contractor submit the required Cost or Pricing Data (all relevant facts), the Contractor has not provided a proper termination settlement proposal containing the Contractor's Cost or Pricing Data.

3) Contractor's Proposal:

a) By letter dated 20 June 2005, Cegali, Inc. (with a Nevada not California address) submitted what it called its "Costing Methodology For The Termination Of The Aliamanu Contract" and provided its "Proposed Termination Settlement Costs" in the amount of $9,764,061. Within the transmittal letter Cegali, Inc. referred to itself as the General Partner of ACP, represented that the proposal was being submitted for ACP, and the letter was signed by Mr. Robert Freeman. The 20 June 2005 termination settlement proposal is summarized in the following table:

| Item | Description | | Amount |
|---|---|---|---|
| 1 | Amortization of Initial Costs | * | $1,575,767 |
| 2 | Amortization of Operating Costs | * | $6,929,721 |
| 3 | Termination Expenses | * | $212,117 |
| 4 | Termination Settlement Costs | | $174,696 |
| 5 | Subtotal = | | $8,892,301 |
| 6 | Fee (Profit on "*" Items 1 - 3) | 10.00% | $871,760 |
| 7 | Total Termination Settlement Amount | | $9,764,061 |

b) A review of the 20 June 2005 proposal revealed that the proposal had not been prepared using one of the termination settlement proposal forms, that the proposal appeared to consist primarily (items 1 & 2) of estimated amounts not received (because the contract had been terminated) instead of actual costs incurred (during performance of the contract), and did not include the Contractor's Cost or Pricing Data (all relevant facts). It appeared as though the Contractor's calculations consisted of the following:

i) Item 1 – Amortization of Initial Costs. It appeared that the Contractor may have started with a total cost[2] amount (presumably all of its labor, equipment, materials, overhead, subcontractors, financing, etc.) that the Contractor alleged that it had incurred to some unspecified point in 1993, the total of which the Contractor then added interest (cost of money) and distributed that amount over 156 months, to arrive at the claimed amount based upon 16.3 months (after the contract was terminated) where there was no performance under the contract because of the termination.

ii) Item 2 – Amortization of Operating Costs. The Contractor's amount appeared to reflect the Contractor's total Operating and Maintenance cost, from Fiscal Year 1990 until the contract was terminated in 2005.

iii) Item 3 – Termination Expenses. The Contractor contended that it incurred cost totaling $212,117 associated with demobilizing from the Housing Area after the effective date of the termination, as depicted below:

| Item | Description | Amount |
|---|---|---|
| 1 | George - 31 Days @ 67.40/HR (Partner) | $16,715 |
| 2 | Payroll Tax on George @ 12% | $2,006 |
| 3 | Supplies (Material turned-over to the Gov't) | $40,000 |
| 4 | Transportation (Hauling 3 Trailers) | $10,000 |
| 5 | Loss on Trucks | $18,000 |
| 6 | Severance Pay to Employees | $106,543 |
| 7 | Payroll Tax on Severance pay @12% | $12,785 |
| 8 | Health Benefits on terminated employees | $4,568 |
| 9 | Transportation of garbage | $1,500 |
| 10 | Total = | $212,117 |

iv) Item 4 – Termination Settlement Costs. To prepare the termination settlement proposal, the Contractor contended that it incurred a total of $174,696 as depicted below:

| Item | Description | Amount |
|---|---|---|
| 1 | Consulting | $118,000 |
| 2 | Legal | $26,458 |
| 3 | In-House Support | $30,238 |
| 4 | Total = | $174,696 |

[2] If the Contractor's alleged total cost amount is correct, this amount ($15,529,422) may be the cost that the Contractor incurred to purchase all of the energy savings equipment, as well as all other costs that the Contractor incurred during the Construction phase of the contract. If this assumption is correct, then any additional cost that the Contractor would have incurred under the contract prior to the termination, should be the cost that the Contractor incurred after the construction phase - during the Maintenance and Operating phase of the contract.

v) Item 6 – Fee (Profit). The Contractor's termination settlement proposal included profit calculated at a rate of ten (10) percent on the first three elements; however, the Contractor did not provide any calculation demonstrating that it was in a profit position - as required by Federal Acquisition Regulation (FAR) 49.203.

c) After receipt of the 20 June 2005 proposal, the TCO notified ACP that the termination settlement proposal had not been prepared in accordance with FAR Table 15-2, and that the proposal did not contain ACP's Cost <u>or</u> Pricing Data. By letter dated 5 July 2005, Cegali (on behalf of ACP) provided what it called its "Certificate" and its "Certificate of Current Cost or Pricing Data." In the "Certificate," Mr. Freeman stated that the proposal had been prepared "from the books of account and records of the Contractor in accordance with recognized commercial accounting practices..." Mr. Freeman also signed a "Certificate of Current Cost or Pricing Data" (which is not required until after price agreement), but no Cost or Pricing Data was provided.

d) The TCO again informed Mr. Freeman that the Contractor needed to submit a termination settlement proposal complying with the requirements of FAR Table 15-2 that included the Contractor's Cost or Pricing Data. By letter dated 31 October 2005, Cegali, Inc. submitted what it called its "Revised Proposal" and provided its "Termination Settlement Proposal" in the amount of $7,641,772. The letter was signed by Mr. Freeman for Cegali, Inc. as the General Partner of ACP.

e) A review of the revised termination settlement proposal revealed that although the methodology used in the revised proposal was different than the initial proposal, the revised proposal still appeared to consist primarily of estimated amounts not received, instead of actual costs incurred, and still did not include the required Contractor's Cost or Pricing Data. The TCO promptly notified Mr. Freeman that the revised proposal still had not been prepared in accordance with the requirements set forth in FAR Table 15-2, and that the proposal did not contain ACP's Cost <u>or</u> Pricing Data. The Contractor's 31 October 2005 revised termination settlement proposal is summarized in the following table:

| Item | Description | | | Amount |
|---|---|---|---|---|
| 1 | Monthly Payments | | | $5,519,180 |
| 2 | Unamortized Asset Value | | * | $1,329,807 |
| 3 | Termination Expenses | | * | $335,077 |
| 4 | Termination Settlement Costs | | | $186,331 |
| 5 | | Subtotal = | | $7,370,395 |
| 6 | Fee (Profit on "*" Items 2 & 3) | | 16.30% | $271,376 |
| 7 | Total Termination Settlement Amount | | | $7,641,772 |

f) Instead of complying with the TCO's request to provide a proper termination settlement proposal, representatives (primarily consultants) of Mr. Freeman initiated several different discussions and email correspondence with various representatives of the TCO concerning whether or not Cost or Pricing Data was required to be submitted by the Contractor. In general, the TCO's representatives repeatedly referred to the FAR requirements, insisted that Cost <u>or</u> Pricing needed to be submitted by the Contractor; and that the settlement amount should be based upon the cost that the Contractor incurred under the contract; while Mr. Freeman's representatives insisted that they had provided Cost <u>and</u> Pricing Data, and that the settlement amount should be based upon the value of the Contractor's work provided under the contract (i.e., payments not made because the contract had been terminated).

g) Attempts to have the Contractor specifically identify its actual cost incurred during the performance of the contract, and to submit its Cost or Pricing Data (that would include the Contractor's actual cost) continued until 20 December 2005 when the TCO received a letter from the Law Offices of Timothy H. Power, which referred to Cegali's October Termination Settlement Proposal, and indicated that attached to the letter were documents that support the cost and pricing data submitted with the proposal." Review of the submission revealed that the documents attached to that letter did, to a certain extent, lend some support to the cost information and the pricing information previously provided by Mr. Freeman; however, the documents attached to that letter still did not represent Cost or Pricing Data (all relevant facts).

h) Since the TCO had tried unsuccessfully several times to have the Contractor submit its Cost or Pricing Data, and it appeared that no amount of explanation, or direction, would result in the Contractor actually providing all of the relevant facts (including the Contractor's actual cost incurred prior to the effective date of the termination), the TCO suggested that the TCO review the Contractor's records to determine what facts the Contractor might have that could be submitted; Mr. Freeman agreed and indicated that the Contractor's records were at Co-Energy Group's office in Las Vegas, Nevada. As a result, the TCO and the undersigned visited Co-Energy Group's office in Las Vegas, Nevada (6 March 2006 through 10 March 2006) and reviewed all of the records made available at that location (see the TCO's memorandum documenting the review of the documents that were made available for review by the TCO). During that visit, and as a result of the review of those records, the TCO orally requested that the Contractor provide specific information that appeared to be readily available to the Contractor. The requested "Information Other than Cost or Pricing Data" consisted of the following:

   i) Regarding the "Unamortized Asset Value" – the TCO requested that the Contractor submit:

      (1) A listing of the specific "energy savings" equipment that was purchased and installed under the contract;
      (2) The specific date each piece of listed equipment was purchased;
      (3) The specific amount paid for each listed piece of equipment; and
      (4) The amount of depreciation already recovered for each listed piece of equipment.

   ii) Regarding the "Termination Expenses" – the TCO requested that the Contractor submit:

      (1) An explanation as to why the list of materials turned-over to the Government (directly to Actus Lend Lease) contained in the termination settlement proposal was different that the signed lists of materials for the actual material turned-over; and
      (2) A narrative explaining how the corporate identity of the Contractor had changed from the entity that was awarded the contract to the entity that was currently representing itself to be the Contractor.

   iii) As of the date of this Memorandum, none of the information specifically identified and requested by the TCO has been provided. As a result, the 20 December 2005 submission is being used as the Contractor's revised termination settlement proposal even though it does not contain the Contractor's Cost or Pricing Data.

i) The Contractor's 20 December 2005 proposal essentially consisted of the same elements as in the Contractor's 31 October 2005 revised termination settlement proposal as summarized in the following table:

| Item | Description | | | Amount |
|---|---|---|---|---|
| 1 | Monthly Payments | | | $5,519,180 |
| 2 | Unamortized Asset Value | * | | $1,329,807 |
| 3 | Termination Expenses | * | | $335,077 |
| 4 | Termination Settlement Costs | | | $186,331 |
| 5 | Subtotal = | | | $7,370,395 |
| 6 | Fee (Profit on "*" Items 2 & 3) | | 16.30% | $271,376 |
| 7 | Total Termination Settlement Amount | | | $7,641,772 |

j) The Contractor's proposed elements are briefly described in the following paragraphs:

i) Item 1 – Monthly Payments: The proposed amount of $5,519,180 represents the fixed monthly payments (consisting of both the energy savings and the maintenance components) that the Contractor would have received had the contract not been terminated (essentially, the fixed amount remaining on the contract when the contract was terminated). It appears that in essence, the Contractor is contending that the TCO had the authority to terminate the contract for the convenience of the Government, but that the Contractor should still receive all of the fixed payments (including any profit in those payments) for the balance of the contract - even though the Contractor's performance under the contract was terminated. This element is problematic at best since even if the Contractor was somehow "entitled" to any "energy savings" after the effective date of the termination (which would represent anticipatory profit); it is extremely difficult to understand how the Contractor could, in any way, be entitled to payment for performing maintenance after the contract was terminated and for which the Contractor did not perform any maintenance work.

ii) Item 2 – Unamortized Asset Value: The proposed amount of $1,329,807 appeared to be based upon the cost to install the energy savings equipment under the contract, distributed equally across the maximum number of months in the contract, and then that monthly rate multiplied by the number of months after the effective date of the termination. It appears that the Contractor may be contending either 1) that even if it were to receive all of the remaining fixed payments under the contract (Item 1), it wouldn't be sufficient to ensure recovery of its initial cost to install the energy savings equipment; or 2) that it included this element in its proposal as an alternate amount (in case it could not recover Item 1). In either event, it would indicate that the Contractor's proposed settlement amount is excessive, since under the first contention the Contractor would be indicating that it was in a loss position, and the proposed settlement amount would be overstated by the amount of the profit ($271,376); and under the second contention, the proposed settlement amount would be overstated by the amount of Item 1 ($5,519,180).

iii) Item 3 – Termination Expenses: The proposed amount of $335,077 was fairly consistent with the corresponding element in the Contractor's initial termination settlement proposal. As reflected in the following table, the Contractor reduced the hourly rate for one of its principals from $67.40 per hour to $57.70 per hour, and reduced the associated payroll taxes, and then added an overhead rate of 60 percent.

| Item | Description | 20-Jun-05 Amount | 20-Dec-05 Amount |
|---|---|---|---|
| 1 | George - 31 Days @ 67.40/HR (Partner) | $16,715 | **$14,310** |
| 2 | Payroll Tax on George @ 12% | $2,006 | **$1,717** |
| 3 | Supplies (Material turned-over to Govt) | $40,000 | $40,000 |
| 4 | Transportation (Hauling 3 Trailers) | $10,000 | $10,000 |
| 5 | Loss on Trucks | $18,000 | $18,000 |
| 6 | Severance Pay to Employees | $106,543 | $106,543 |
| 7 | Payroll Tax on Severance pay @12% | $12,785 | $12,785 |
| 8 | Health Benefits on terminated employees | $4,568 | $4,568 |
| 9 | Disposal of Oil and Garbage | $1,500 | $1,500 |
| 10 | Total = | $212,117 | $209,423 |
| 11 | Overhead @ 60% | | **$125,654** |
| 12 | Revised Total = | | $335,077 |

iv) Item 4 – Termination Settlement Costs: The proposed amount of $186,331 was fairly consistent (slightly increased) with the corresponding element in the Contractor's initial termination settlement proposal, and consisted of the following:

| Description | Amount |
|---|---|
| Consulting - Bill Lennett | $109,400 |
| Legal Expenses - Tim Power | $49,200 |
| Owner - Bob Freeman | $27,731 |
| Total = | $186,331 |

v) Item 6 – Fee (or Profit): The Contractor's termination settlement proposal included 16.3 percent profit on the second and third elements of the proposal; however, the Contractor still did not provide any calculation demonstrating that it was in a profit position when the contract was terminated - as required by Federal Acquisition Regulation (FAR) 49.203.

4) Cost or Pricing Data:

a) As discussed above, this termination action required the submission of Cost or Pricing Data (all relevant facts); however, despite repeated requests from the TCO, the Contractor argued that Cost or Pricing Data was not required and that the submission of their Cost and Pricing Data was all that was required. After an extended period of time attempting to explain what was meant by the phrase "Cost or Pricing Data" and what related "facts" the Contractor should be providing; the TCO, in an effort to overcome the impasse between the parties suggested (and the Contractor agreed) that the TCO could review the Contractor's records and might be able to identify factual items of information that the Contractor had that was relevant to the termination settlement and could affect the negotiations. As a result of the TCO's review of the Contractor's records, the TCO orally requested that the Contractor provide specific information that appeared to be readily available to the Contractor; and the Contractor agreed to provide the requested "Information Other than Cost or Pricing Data." However, to date, the Contractor still has not provided either the required and requested "Cost or Pricing Data" with its termination settlement proposal nor has the Contractor provided the specific "Information Other than Cost or Pricing Data" that the TCO's requested.

b) Although the undersigned believes that negotiations should be conducted with the Contractor in an effort to resolve the termination, the undersigned also believes that the absence of the Contractor's Cost or Pricing Data will substantially affect the negotiations and could hamper the TCO's ability to determine, with certainty, an equitable termination settlement amount. The undersigned expects that during the negotiations, the Contractor will most likely argue, among other things, that the termination settlement should be based upon the "value" of the contract and not based upon the actual cost that the Contractor incurred prior to the date the contract was terminated; and that this "difference of opinion" will adversely affect the ability to reach a negotiated termination settlement amount (as opposed to the Contractor insisting on receiving its proposed "Monthly Payments" and "Unamortized Asset Value" amounts). Although the Contractor's refusal to submit its Cost or Pricing Data is expected to adversely affect the negotiations of the pre-termination cost, it should have a much lesser effect on the negotiations of the post-termination cost (i.e., the Contractor's proposed "Termination Expenses" and "Termination Settlement Costs" amounts). The negotiations of the "Profit" component, which normally would involve negotiating a profit rate to be used (because the Contractor would have already demonstrated whether or not it was in a profit position when the contract was terminated), will also be adversely affected by the absence of the Contractor's Cost or Pricing Data, since the parties will have to first determine (without the facts) whether or not the Contractor was in a profit position when the contract was terminated.

c) The Contractor's insistence that they were not required to provide "Cost <u>or</u> Pricing Data," and their later insistence that they had provided "Cost <u>and</u> Pricing Data," which was all that they were required to provide - seems to involve their insistence that the termination settlement should be based upon the "contract value" instead of the Contractor's "incurred cost," or it could be because they do not understand the difference between the two different phrases, as discussed below:

   i) "Cost <u>or</u> Pricing Data" as defined in FAR Part 2 means "all facts that…prudent buyers and sellers would reasonably expect to affect price negotiations significantly. Cost or Pricing Data…are factual, not judgmental; and are verifiable...Cost or Pricing Data are more than historical accounting data; they are all the facts that can be reasonably expected to contribute to the soundness of estimates of future costs and to the validity of determinations of costs already incurred."

   ii) "Cost <u>and</u> Pricing Data" is a combination of "Cost Data" (i.e., labor rates, unit prices, etc.) <u>and</u> "Pricing Data" (i.e., overhead rates, profit rates, market conditions, etc.), and "Cost <u>and</u> Pricing Data" is what one might normally see when examining a Contractor's proposal – and it is something that someone could say needs to be provided in some sort of format (i.e., Columns for Labor, Equipment, Material, etc.), and it could even be required to be submitted to some specific level of detail (i.e., proposed amounts for 1st and 2nd tier subcontractors must use the same format). "Cost <u>or</u> Pricing Data" however – is not limited to just Cost Data or Pricing Data – instead "Cost <u>or</u> Pricing Data" is a phrase/term that has been specifically defined in the Federal Acquisition Regulations as being "all the relevant facts" – which ultimately should be the basis for the Contractor's proposed Cost Data <u>and</u> its proposed Pricing Data; but regardless of whether or not the Contractor's proposed Cost Data or its proposed Pricing Data is based upon "Cost or Pricing Data," the negotiations need to be based upon "Cost or Pricing Data" (all relevant facts) even if the Contractor had those facts, but did not use those facts in preparing its proposal.

d) In its initial 20 June 2005 proposal, it appeared as though the Contractor had, to a certain extent, attempted to identify at least two things, which if factual, would have substantially facilitated the negotiations. For example, in calculating the first element of that proposal (Amortization of Initial Costs), the Contractor used an amount of $14,318,422, which might reflect the actual cost that the Contractor incurred to purchase and install the energy savings equipment during the initial Construction phase of the contract; and in calculating the second element of that proposal (Amortization of Operating Costs), the Contractor provided information that suggested an amount of $22,714,888, which might reflect the actual cost that the Contractor incurred after the initial Construction phase of the contract, during the Operating and Maintenance phase of the contract. Had the Contractor been able to confirm these amounts as factual items, it would seem that the Contractor's pre-termination cost would have been fairly easy to establish; however, as discussed before, instead of confirming these amounts or providing the correct actual cost that the Contractor incurred, the Contractor moved away from this information and began arguing that the termination settlement amount should be based upon the "contract value" and not on the actual cost incurred by the Contractor during the performance of the contract.

5) <u>Technical Analysis</u>:

a) On 9 May 2006, the undersigned completed a Technical Analysis Report (TAR) concerning this contract action. In conjunction with preparing that report, the undersigned reviewed the contract documents as awarded, the contract modifications, the contract payments, various items of correspondence (including letters and email messages) between the contracting parties, as well as various documents that were obtained during the fact-finding visit to Co-Energy Group's office in Las Vegas, Nevada. As discussed in the TAR the undersigned reviewed the proposal submitted by letter dated 20 December 2005, from the Law Offices of Timothy H. Power, and provided various comments resulting from the undersigned's review of that submission. In the TAR, the undersigned reported that the submission did not contain the required Cost or Pricing Data, and that the submission had not been prepared in accordance with the proposal submission instructions contained in Federal Acquisition Regulation (FAR) Table 15-2, and that because the submission did not contain the Contractor's Cost or Pricing Data (all the relevant facts), the TAR was qualified to the extent that the TAR might need to be revised if factual information was later uncovered or otherwise submitted by the Contractor. To date, no additional factual information has been disclosed or submitted by the Contractor.

b) The TAR outlined the proper method to establish the final price of the terminated contract which involved identifying the actual cost that the Contractor incurred during the performance of the contract, and based upon some of the information provided by the Contractor in its initial proposal, indicated that the Contractor may have been in a profit position when the contract was terminated, and if it was in a profit position, then a reasonable profit rate would need to be established and applied to the Contractor's total cost incurred prior to the termination. To this combined amount (total incurred cost plus profit), amounts for the Termination Expenses and the Termination Settlement Costs would need to be added, resulting in the final price for the terminated contract. Then, to determine what amount was owed to the Contractor, the amount that the Government had already paid the Contractor (including all partial termination payments) would need to be subtracted from the final price established for the terminated contract.

c) In an attempt to estimate whether or not the Contractor was in a profit position when the contract was terminated, within the TAR some of the information included in the Contractor's initial proposal was used to estimate first, an incurred amount for what the Contractor appeared to classify as the "Construction Phase" of the contract; and then an incurred amount for what the Contractor classified as being the "Operating and Maintenance Phase" of the contract; which when added together should have been the Contractor's total pre-termination cost. This process resulted in generating a total Construction Phase amount of approximately $20,206,215 (Direct and Indirect Cost of $14,318,422 plus Cost of Facilities Capital (COFC) of $5,887,793) and a total Operating and Maintenance Phase amount of $22,714,888 (Direct and Indirect Cost)– for an estimated total incurred cost of approximately $42,921,103. After establishing the estimated pre-termination cost, the undersigned compared that total amount to the corresponding pre-termination payments that the Contractor had received; and since the payments exceeded the estimated cost, the TAR concluded that the Contractor was most likely in a profit position when the contract was terminated. If one were to assume that the difference between the pre-termination cost and the pre-termination payments represented a reasonable amount of profit, then the only additional payment that the Contractor would only be entitled to would be for its post-termination cost.

d) In the TAR, the undersigned reported that the Contractor's 20 December 2005 termination settlement proposal was inadequate and most likely could not be used as basis for negotiating a proper contract termination settlement, but that it might be used as a basis for negotiating the post-termination cost (Termination Expenses and Termination Settlement Costs). Although not specifically quantified; in the analysis of the Contractor's proposed $335,077 for Termination Expenses, the TAR provided narrative rationale for questioning approximately $192,635; leaving only $142,442 as being unquestioned; and of the Contractor proposed $186,331 for Termination Settlement Costs, the TAR provided narrative rationale for questioning approximately $43,591; leaving only $142,740.

e) As of February 2005, the Contractor had received payments totaling $47,452,392 consisting of $46,379,724 for pre-termination work and $1,072,668 as partial termination payments. Although not specifically quantified, the results of the TAR indicated that a termination settlement amount could be established as depicted in the following table:

| | | | | |
|---|---|---|---|---|
| Total Estimated Incurred Cost | | | | |
| Construction Phase | | $20,206,215 | | |
| O & M Phase | | $22,714,888 | | |
| | Subtotal = | $42,921,103 | | |
| Profit | | $3,458,621 | 8.06% | |
| | Total = | $46,379,724 | | Already Paid |
| Total Post-Termination Cost | | | | |
| Termination Expenses | | $142,442 | | |
| Settlement Cost | | $142,740 | | |
| | Total = | $285,182 | | |
| Final Contract Amount | | | | |
| Incurred Cost plus Fee | | $46,379,724 | | |
| Post Termination Cost | | $285,182 | | |

| | | |
|---|---|---|
| Final Contract Amount = | $46,664,906 | |
| Amount Owed Contractor | | |
| Final Contract Amount | $46,664,906 | |
| less Pre-Termination Monthly Payments | ($46,379,724) | Already Paid |
| less Post-Termination Partial Payments | ($1,072,668) | Already Paid |
| Additional Amount Owed Contractor = | ($787,486) | |

f) As depicted above, based upon extending the method, estimates, and rationale contained in the Technical Analysis Report alone, the termination settlement agreement would reflect a final contract price of approximately $46,664,906; and since the Contractor has already been paid a combined total of $47,452,392; the Contractor would need to repay the Government approximately $787,486.

6) <u>DCAA Audit Report</u>:

a) Since the Contractor's termination settlement proposal exceeded $100,000, in accordance with FAR 49.107, on 17 March 2006 the TCO requested that the Defense Contract Audit Agency (DCAA) perform an audit of the Contractor's termination settlement proposal. Despite encountering considerable difficulties attempting to obtain verifiable information from the Contractor, on 23 August 2006, the DCAA issued Audit Report No. 04141-2006G1710002 (referred to as the "audit report" herein). Similar to the TAR, the audit report concluded that the Cost or Pricing Data submitted by the Contractor was not adequate; that the proposal did not comply with the requirement of FAR; and that the Contractor's proposal did not provide an acceptable basis for negotiating a fair and reasonable contract termination settlement amount. The audit report stated that in order to make the proposal adequate for negotiations, the Contractor would need to submit a termination settlement proposal based upon the cost it had incurred, supported by Cost or Pricing Data that including accounting books and cost records supporting the proposed amount, instead of submitting a proposal based upon the payments not made (because the contract had been terminated).

b) Although the DCAA could have simply reported the above to the TCO, and then waited for a properly prepared termination settlement proposal before conducting their audit; as requested by the TCO, the DCAA reviewed the Contractor's 20 December 2005 proposal to the extent possible; which resulted in questioning $7,183,224 (94%) of the total proposed amount of $7,641,772 leaving only $458,548 as unquestioned amounts. Essentially, the results of the audit report are very similar to the results of the TAR in that the DCAA questioned the first two elements of the Contractor's proposal in their entirety, and then provided narrative rationale for questioning portions of the Contractor's post-termination cost. In the audit report, the DCAA questioned $62,861 of the Contractor's proposed $335,077 for Termination Expense leaving only $272,216 as being unquestioned; and did not question any of the Contractor's proposed $186,331 for Termination Settlement Costs. The DCAA provided various other comments suggesting that some of the Contractor's proposed amounts could be slightly higher or lower depending upon an evaluation of the amounts by the TCO.

c) If the DCAA audit report was used just for the post-termination cost, and the estimated pre-termination from the TAR was used, a termination settlement amount could be established as depicted in the following table:

| | | | | |
|---|---|---|---|---|
| Total Estimated Incurred Cost | | | | |
| Construction Phase | | $20,206,215 | | |
| O & M Phase | | $22,714,888 | | |
| | Subtotal = | $42,921,103 | | |
| Profit | | $3,458,621 | 8.06% | |
| | Total = | $46,379,724 | | Already Paid |
| Total Post-Termination Cost | | | | |
| Termination Expenses | | $272,216 | | DCAA |
| Settlement Cost | | $186,331 | | DCAA |
| | Total = | $458,547 | | |
| Final Contract Amount | | | | |
| Incurred Cost plus Fee | | $46,379,724 | | |
| Post Termination Cost | | $458,547 | | |
| | Final Contract Amount = | $46,838,271 | | |
| Amount Owed Contractor | | | | |
| Final Contract Amount | | $46,838,271 | | |
| less Pre-Termination Monthly Payments | | ($46,379,724) | | Already Paid |
| less Post-Termination Partial Payments | | ($1,072,668) | | Already Paid |
| | Additional Amount Owed Contractor = | ($614,121) | | |

d) As depicted above, based upon extending the method and estimates contained in the Technical Analysis Report; and then using the unquestioned post-termination amounts from the DCAA audit report, the termination settlement agreement would reflect a final contract price of approximately $46,838,271; and since the Contractor has already been paid a combined total of $47,452,392; the Contractor would need to repay the Government approximately $614,121.

7) Cost Analysis:

a) Performing a cost analysis of the Contractor's 20 December 2005 submission would provide rather meaningless results because of the manner that the Contractor selected to "claim" additional compensation from the terminated contract. As described in both the Technical Analysis Report and the DCAA Audit Report, the first two elements of the Contractor's submission ("Monthly Payments" and "Unamortized Asset Value") do not reflect cost at all, but rather reflect payment amounts that the Contractor "claims" it should receive because the contract was terminated – a remedy (Breach of Contract) that might be available under a commercial contract but it is not a remedy available under a Federal Government contract. However, as discussed above, the next two elements of the Contractor's submission ("Termination Expenses" and "Termination Settlement Costs") do reflect what would normally be a Contractor's post-termination cost, can be analyzed, and, at least negotiations for the post-termination cost could be based upon a cost analysis.

b) The cost included as "Termination Expenses" in the Contractor's 20 December 2005 submission consists of the following:

**Termination Expenses**

| Item | Description | | 20-Dec-05 Amount |
|---|---|---|---|
| 1 | George - 31 Days @ 57.70/HR (Partner) | | $14,310 |
| 2 | Payroll Tax on George @ 12% | | $1,717 |
| 3 | Supplies (Material turned-over to Govt) | | $40,000 |
| 4 | Transportation (Hauling 3 Trailers) | | $10,000 |
| 5 | Loss on Trucks | | $18,000 |
| 6 | Severance Pay to Employees | | $106,543 |
| 7 | Payroll Tax on Severance pay @12% | | $12,785 |
| 8 | Health Benefits on terminated employees | | $4,568 |
| 9 | Transportation of garbage | | $1,500 |
| 10 | | Subtotal = | $209,423 |
| 11 | Overhead @ 60% | | $125,654 |
| 12 | | Total = | $335,077 |

i) As discussed above, some of the Contractor's proposed costs were questioned in the Technical Analysis Report as well as in the DCAA audit report. The following table depicts the areas where the proposed cost were questioned:

| Item | Description | | 20-Dec-05 Amount | TAR Questioned Amount | Audit Questioned Amount | Notes |
|---|---|---|---|---|---|---|
| 1 | George - 31 Days @ 57.70/HR (Partner) | | $14,310 | $14,310 | $0 | A |
| 2 | Payroll Tax on George @ 12% | | $1,717 | $1,717 | $0 | A |
| 3 | Supplies (Material turned-over to Govt) | | $40,000 | $21,288 | $21,288 | B |
| 4 | Transportation (Hauling 3 Trailers) | | $10,000 | $0 | $0 | C |
| 5 | Loss on Trucks | | $18,000 | $18,000 | $18,000 | D |
| 6 | Severance Pay to Employees | | $106,543 | $6,427 | $0 | E |
| 7 | Payroll Tax on Severance pay @12% | | $12,785 | $671 | $0 | E |
| 8 | Health Benefits on terminated employees | | $4,568 | $4,568 | $0 | F |
| 9 | Transportation of garbage | | $1,500 | $0 | $0 | G |
| 10 | | Subtotal = | $209,423 | $66,981 | $39,288 | |
| 11 | Overhead @ 60% | | $125,654 | $125,654 | $23,573 | H |
| 12 | | Total = | $335,077 | $192,635 | $62,861 | |

Notes:

A – The proposed amounts represented the number of hours (8 hours per day for 31 days = 248 hours) that one of the Contractor's Owners expended supervising the Contractor's demobilization from the Housing Area. The TAR questioned both the direct labor amount and the associated payroll taxes in their entirety, since the cost for an Owner should have be included in the Contractor's overhead rate and not included as a direct cost. Although the DCAA did not question any of the proposed hours, the DCAA reported that only 161 hours had been associated with supervising the demobilization effort and that the remaining hours should have been classified as settlement expenses. As reflected in the next table, the Cost Analysis amounts are based upon 161 hours.

B - When the contract was terminated; the Contractor had a supply of various spare parts that they used to perform their routine maintenance. Instead of having the Contractor dispose of the material or restocking it, the Government agreed to accept the supplies from the Contractor and make it Government furnished materials under the new Base Privatization contract that was going to be taking over the housing area. As a result, the Contractor turned-over the material that it had to the Privatization Contractor while representatives of the U.S. Army Corps of Engineers and the Department of Public Works counted the items. At the conclusion of that process, representatives of the Government signed copies of the listing of material. The total cost associated with the material that was counted and turned-over was $18,712.05 – this is the amount that the Contractor should have included for this item. Both the TAR and the audit report questioned the same amount and used the amount reflected on the signed sheets. This issue was discussed with Mr. Freeman during the review of the records in Nevada, and Mr. Freeman agreed that only the amount from the signed sheets should have been included in the termination settlement proposal. The Cost Analysis Amount in the following table is based upon the signed sheets.

C - This item is associated with the removal and disposal of the various things in the Contractor's storage yard and is both allowable and allocable. Neither the TAR nor the audit report questioned the proposed amount; and the DCAA confirmed that the Contractor actually incurred the proposed amount.

D - When the contract was terminated, the Contractor had some of its vehicles at the site; and as part of it demobilization, the Contractor decided to sell the vehicles that it owned instead of moving the vehicles to another location. The trucks that the Contractor is claiming were never Government property, but rather were most likely part of the Contractor's field office. The fact that the Contractor may have sold its own vehicles for an amount less than what it believes the vehicles may have been worth does not in any way transfer any liability to the Government. This item is both unallowable and unallocable and was questioned in its entirety in both the TAR and the audit report.

E - When the contract was terminated, the Contractor did not have any other work in the immediate area for its workforce and the Contractor terminated the employment of its on-site workforce. The TAR questioned amount reflected removing the payments to Kaiser Foundation, Gaspro, and payment to individuals in lieu of vacation; since the severance amount was then being used to estimate the severance payroll taxes. Although the audit report did not question the costs included under this item, the non-payroll amount have been removed in the Cost Analysis amount in the following table.

F – As discussed above, the $4,568 payment to Kaiser was removed from the above element (to prevent improperly calculating a percentage for payroll taxes). The amount included in the following table for Cost Analysis amount includes this payment to Kaiser and the other non-payroll amounts removed from the above item.

G – Neither the TAR nor the audit report questioned this amount; however, the DCAA's review of the Contractor's records revealed that the Contractor had incurred $2,560 instead of the proposed $1,500. The amount included in the following table for Cost Analysis amount is based upon the Contractor's actual cost as identified by the DCAA.

H – The TAR questioned the proposed overhead because the Contractor had used an incorrect method of calculating its overhead that did not consider the contract billings. The DCAA apparently was not able to obtain sufficient information from the Contractor to properly calculate the Contractor's overhead rate, and applied the proposed rate to the adjusted direct cost. Since the Contractor will have an overhead rate of some amount, although it may be considerable different than the improperly calculated rate; the amount included in the following table for Cost Analysis amount is based upon applying an overhead rate of 60% to the revised total direct cost amount[3].

ii) As described above, based upon a Technical Analysis, a DCAA audit report, and a Cost Analysis, the Contractor's proposed "Termination Expenses" should be reduced as reflected in the following table:

**Termination Expenses**

| Item | Description | 20-Dec-05 Amount | TAR Remaining Amount | Audit Remaining Amount | Cost Analysis Amount |
|---|---|---|---|---|---|
| 1 | George - (Partner) | $14,310 | $0 | $14,310 | $9,290 |
| 2 | Payroll Tax on George @ 12% | $1,717 | $0 | $1,717 | $1,115 |
| 3 | Supplies (Material turned-over) | $40,000 | $18,712 | $18,712 | $18,712 |
| 4 | Transportation (Hauling 3 Trailers) | $10,000 | $10,000 | $10,000 | $10,000 |
| 5 | Loss on Trucks | $18,000 | $0 | $0 | $0 |
| 6 | Severance Pay to Employees | $106,543 | $100,116 | $106,543 | $100,116 |
| 7 | Payroll Tax on Severance pay @12% | $12,785 | $12,114 | $12,785 | $12,114 |
| 8 | Health Benefits (etc.) | $4,568 | $0 | $4,568 | $6,427 |
| 9 | Transportation of garbage | $1,500 | $1,500 | $1,500 | $2,560 |
| 10 | Subtotal = | $209,423 | $142,442 | $170,135 | $160,333 |
| 11 | Overhead @ 60% | $125,654 | $0 | $102,081 | $96,200 |
| 12 | Total = | $335,077 | $142,442 | $272,216 | $256,534 |

c) The cost included as "Termination Settlement Costs" in the Contractor's 20 December 2005 submission consists of the following:

| Description | Proposed Amount |
|---|---|
| Consulting - Bill Lennett | $109,400 |
| Legal Expenses - Tim Power | $49,200 |
| Owner - Bob Freeman | $27,731 |
| Total = | $186,331 |

i) As previously discussed, some of the Contractor's proposed "Termination Settlement Costs" were questioned in the Technical Analysis Report but none of the proposed amounts were questioned in the DCAA audit report, although the DCAA did provide some related findings and comments. The following table depicts the areas where the proposed cost were questioned:

[3] This issue is discussed greater depth in paragraph 10 below.

**Termination Settlement Costs**

| Description | | Proposed Amount | TAR Questioned Amount | Audit Questioned Amount | Notes |
|---|---|---|---|---|---|
| Consulting - Bill Lennett | | $109,400 | $10,940 | $0 | A |
| Legal Expenses - Tim Power | | $49,200 | $4,920 | $0 | B |
| Owner - Bob Freeman | | $27,731 | $27,731 | $0 | C |
| | Total = | $186,331 | $43,591 | $0 | |

Notes –

A – The "Consulting" amount was purportedly associated with reviewing the Contractor's cost and accounting records to assemble the Contractor's Cost or Pricing Data and to prepare the Contractor's termination settlement proposal. For the Consulting amount, the proposal contains both actual billings and projected amounts associated with negotiating the termination settlement. The TAR questioned amount reflected a 10% reduction in the actual hours where the consultant (a prior DCAA auditor) was arguing that Cost or Pricing Data was not required. The audit report did not question any of the proposed amounts and reported that as of late May 2006 the Contractor had incurred Consulting cost of $114,295. In order for the Contractor to recover its incurred cost, the cost must be allowable, allocable, and reasonable. Consulting cost would be both allowable and allocable, but expending hours arguing with the TCO that the submission of Cost or Pricing Data was not required and then preparing a termination settlement proposal based upon payments not made, instead of incurred cost is simply not reasonable. The Cost Analysis amount, included in the following table, is based upon the increased amount reported by the DCAA; reduced for the hours recorded between 20 June 2005 (the date of the initial proposal) and 20 December 2005 (the date of the revised submission - 78 hours at $200/hour); and reducing the anticipated hours to negotiate the termination settlement from 98 hours to 30 hours.

B – The "Legal Expenses" are purportedly associated with reviewing the Contractor's cost and accounting records to assemble the Contractor's Cost or Pricing Data and to prepare the Contractor's termination settlement proposal. The proposed amount includes both actual billings and projected amounts associated with negotiating the termination settlement. The TAR questioned amount reflected a 10% reduction in the actual hours where the lawyer was arguing that Cost or Pricing Data was not required. The audit report did not question any of the proposed amounts and reported that as of late May 2006 the Contractor had incurred Legal cost of $41,431. In order for the Contractor to recover its incurred cost, the cost must be allowable, allocable, and reasonable; legal expenses associated with preparing a proper termination settlement proposal would be both allowable and allocable, but expending hours arguing with the TCO that the submission of Cost or Pricing Data was not required and then preparing a commercial breach of contract claim based upon payments not made, instead of incurred cost, is simply not reasonable. In accordance with FAR 31.205-47 legal fees associated with preparing a claim against the Government is explicitly unallowable; and FAR places a cap of $150 per hour as a "reasonable" level for attorney's fees (see Part 33 and others). The Cost Analysis amount, included in the following table, is based upon the increased hours reported by the DCAA (approximately 166 hours); reduced for the hours recorded between 20 June 2005 (the date of the initial proposal) and 20 December 2005 (the date of the revised submission - 33 hours); and reducing the anticipated hours to negotiate the termination settlement from 98 hours to 10 hours – for a total of 143 hours at $150/hour.

C – The "Owner" amount is purportedly associated with the time expended by one of the Owner's of the Contractor in reviewing the Contractor's cost and accounting records to assemble the Contractor's Cost or Pricing Data and to prepare the Contractor's termination settlement proposal. The proposed amount includes both recorded hours and projected hours associated with negotiating the termination settlement. The TAR questioned the entire amount since the "Owner's" salary is normally included in the Contractor's accounting records as an indirect cost, not a direct cost, and is then recovered through the application of the Contractor's overhead rate (in this case through several different overhead rates for different corporate entities). In accordance with FAR 31.202 and 31.203, once an appropriate base for allocating indirect costs has been accepted, the Contractor shall not fragment the base by removing individual elements. The audit report did not question any of the proposed amounts and reported that as of late May 2006 Mr. Freeman (also a lawyer) had recorded 405 hours (at $64.62/hour – including payroll tax); and that the Contractor had not included these Owner hours in its overhead rate calculations. In order for the Contractor to recover its incurred cost, the cost must be allowable, allocable, and reasonable; direct charged hours associated with preparing a proper termination settlement proposal would be both allowable and allocable, but expending hours arguing with the TCO that the submission of Cost or Pricing Data was not required and then preparing a commercial breach of contract claim based upon payments not made, instead of incurred cost, is simply not reasonable. The Cost Analysis amount, included in the following table, is based upon the increased hours reported by the DCAA; reduced for hours between 20 June 2005 (the date of the initial proposal) and 20 December 2005 (the date of the revised submission - 80 hours); and reducing the anticipated hours to negotiate the termination settlement from 138 hours to 10 hours; plus removing two of the projected three trips for meetings with the Government – for a total of 335 hours at $64.62/hour plus $1,700 (travel). In addition, the Cost Analysis amount, reflected below, also includes cost for one of the other Owners (George – see paragraph 7-b-i Note A above)) for attending the meeting with the TCO in Nevada, meeting with the DCAA, and projected hours associated with negotiating the termination settlement agreement (48 hours at $64.62/hour).

ii) As described above, based upon a Technical Analysis, a DCAA audit report, and a Cost Analysis, the Contractor's proposed "Termination Settlement Costs" should be reduced as reflected in the following table:

| Termination Settlement Costs<br>Description | Proposed Amount | TAR Remaining Amount | Audit Remaining Amount | Cost Analysis Amount |
|---|---|---|---|---|
| Consulting - Bill Lennett | $109,400 | $98,460 | $109,400 | $85,095 |
| Legal Expenses - Tim Power | $49,200 | $44,280 | $49,200 | $21,450 |
| Owner - Bob Freeman (plus) | $27,731 | $0 | $27,731 | $26,449 |
| Total = | $186,331 | $142,740 | $186,331 | $132,994 |

d) Based upon a cost analysis of the Contractor's proposed post-termination cost, the proposed amount should be reduced as reflected in the following table:

| Post-Termination | 20-Dec-05 Amount | TAR Remaining Amount | Audit Remaining Amount | Cost Analysis Amount |
|---|---|---|---|---|
| Termination Expenses | $335,077 | $142,442 | $272,216 | $256,534 |
| Termination Settlement Costs | $186,331 | $142,740 | $186,331 | $132,994 |
| | $521,408 | $285,182 | $458,547 | $389,528 |

e) In the absence of any real Contractor submitted pre-termination cost, and by using the method set forth in the Technical Analysis Report, each of these amount could be translated into a projected termination settlement amount as reflected below:

| | | | 20-Dec-05 Amount | TAR Remaining Amount | Audit Remaining Amount | Cost Analysis Amount |
|---|---|---|---|---|---|---|
| Total Estimated Incurred Cost | | | | | | |
| Construction Phase | | | $20,206,215 | $20,206,215 | $20,206,215 | $20,206,215 |
| O & M Phase | | | $22,714,888 | $22,714,888 | $22,714,888 | $22,714,888 |
| | Subtotal = | | $42,921,103 | $42,921,103 | $42,921,103 | $42,921,103 |
| Profit (or Fee) | | 8.06% | $3,458,621 | $3,458,621 | $3,458,621 | $3,458,621 |
| | Total = | Paid | $46,379,724 | $46,379,724 | $46,379,724 | $46,379,724 |
| Total Post-Termination Cost | | | | | | |
| Termination Expenses | | | $335,077 | $142,442 | $272,216 | $256,534 |
| Termination Settlement Cost | | | $186,331 | $142,740 | $186,331 | $132,994 |
| | Total = | | $521,408 | $285,182 | $458,547 | $389,528 |
| Final Contract Amount | | | | | | |
| Incurred Cost plus Fee | | | $46,379,724 | $46,379,724 | $46,379,724 | $46,379,724 |
| Post Termination Cost | | | $521,408 | $285,182 | $458,547 | $389,528 |
| | Final Contract Amount = | | $46,901,132 | $46,664,906 | $46,838,271 | $46,769,252 |
| Amount Owed Contractor | | | | | | |
| Final Contract Amount | | | $46,901,132 | $46,664,906 | $46,838,271 | $46,769,252 |
| less Pre-Termination Payments | | Paid | ($46,379,724) | ($46,379,724) | ($46,379,724) | ($46,379,724) |
| less Post-Termination Payments | | Paid | ($1,072,668) | ($1,072,668) | ($1,072,668) | ($1,072,668) |
| | Additional Amount Owed Contractor = | | ($551,260) | ($787,486) | ($614,121) | ($683,140) |

f) As depicted above, based upon extending the termination settlement method explained in the Technical Analysis Report, and the Contractor's estimated cost incurred during performance of the contract (from the Contractor's initial proposal); even with the all of the alleged post-termination cost included in the Contractor's 20 December 2005 submission, it would appear that the Contractor has been overpaid. However, the Contractor's proposed post-termination amount includes duplicated, unallowable, unallocable, and/or unreasonable amounts that can not be accepted. After making adjustments for these unacceptable items, as well as increasing certain items to reflect the additional information discovered by the DCAA during their audit, the final contract price would be approximately $46,769,252; and since the Contractor has already been paid a combined total of $47,452,392; the Contractor would need to repay the Government approximately $683,140.

g) The most significant shortcoming associated with the above analysis is that it is based upon the, almost tangential, cost information contained in the Contractor's initial proposal, and nothing provided by the Contractor after the initial proposal can be used to confirm the Contractor's incurred pre-termination cost; coupled with the fact that the DCAA was not able to quantify the Contractor's incurred pre-termination cost. Without the Contractor's submission of its Cost or Pricing Data (including relevant documentation for its actual incurred pre-termination cost), it would seem that the only recourse currently available to the TCO would be to reexamine the TAR estimate developed from the Contractor's initial information and to determine the credibility of the Contractor's initial proposal information.

i) In the TAR, the undersigned used two different amounts; $20,206,215 for the Construction Phase, and $22,714,888 for the O&M Phase; which resulted in estimating a total incurred pre-termination cost of $42,921,103 ($46,379,724 including profit), as reflected in the above table. How these amounts were determined and what effect an adjustment to these amount might cause is reviewed below:

(1) Construction Phase Amount: The estimated amount was based upon the Contractor's proposed amount of $14,318,422 (shown in the initial proposal, under "Amortization of Initial Cost" – after interest had been removed). The TAR assumed that this full amount had been financed over a 13-year period at 5.56% (also stated in the initial proposal); and based upon that information, a loan repayment schedule was developed, with the first quarterly amount being $388,581 (on 1 April 1992) and the last quarterly amount being on 1 January 2005 (coinciding with the approximate end of the Contractor's construction loan). Using these assumptions, the undersigned determined that in order for the Contractor to repay the entire loan, the Contractor should have incurred a total cost of $20,206,215. To date, only two items have been uncovered, that involve the assumptions used to generate the estimate; however, as described below, one of these should not affect the estimate, but the other one could result in estimating a smaller Construction Phase cost, which in turn would mean establishing a smaller final contract amount, and in-turn increasing the amount that the Contractor would need to repay the Government.

(a) In both the TAR and the audit report the Contractor's alleged cost associated with purchasing the energy savings equipment (part of the $14,318,422) was questioned since the proposed amount included items other than cost associated with the purchase of the energy saving equipment. In the estimate of the Construction Phase cost, it was assumed that the purchase, installation, supervision, and indirect cost were all included in the $14,318,422; therefore, moving part of the purchase amount to one of the other construction phase cost categories should not have any effect on the total construction phase amount or the undersigned's estimate of the Contractor's construction phase amount.

(b) As discussed above, the amount of the construction phase estimate was based upon financing the full amount of $14,318,422 over a 13-year period; however, the Contractor's financing records seem to indicate that it may have obtained a line-of-credit (instead of a full loan), and then only withdrew a certain amount (less than the full amount) only when it needed to make

payments as the work progressed. If this is the case, then the total repayment amount would be substantially less than the estimated amount of $20,206,215, which in turn would mean establishing a smaller final contract amount, and increasing the amount the Contractor would need to repay the Government. For example, in the undersigned's estimate, the total construction phase amount of $20,206,215 included the direct amount of $14,318,422 and the difference ($5,887,793) representing the Contractor's cost of facilities capital. But, if as represented in the Contractor's initial proposal, the cost of the Contractor financing the work was actually only $1,211,000 (instead of $5,887,793), then the construction phase amount of $20,206,215 would be reduced to $15,529,422 – which would result in increasing the amount the Contractor would need to repay the Government by $4,676,793 - over the amount shown in the above table.

(2) O&M Phase Amount: The estimated amount of $22,714,888 was based upon the Contractor's fiscal year operating expense information submitted with its initial proposal, with adjustments being made for non-allowable amounts, and assuming that the Parent Corporation's (CEG's) indirect costs could be distributed proportionally across the three different business centers. The estimate also included another unstated assumption, being that none of the "operating expenses" included any of the Contractor's construction phase cost; and that none of the Contractor's construction phase cost included any of the Contractors's operating expenses. Provided that this assumption is correct, then there should not be any other reason to adjust the estimated O&M phase cost of $22,714,888; however, if the Contractor's cost were not completely segregated, then either the estimated construction phase amount, or the estimated O & M phase amount, would be overestimated – and after the duplicated amounts were removed, the total cost would decrease, resulting in increasing the amount the Contractor would need to repay the Government.

ii) Regarding the credibility of the Contractor's information contained within the Contractor's initial proposal; one needs to consider that on 5 July 2005 the Contractor provided a "Certificate" and a separate "Certificate of Current Cost or Pricing Data" attesting to the accuracy of the Contractor's submitted information. Since that time, the Contractor provided a revised proposal, based upon a misplace breach of contract theory that would apply to a commercial contract, but not to a Federal Government contract, however, nothing in that revised proposal can be construed as casting a credibility shadow on the Contractor's initially submitted cost information. Generally, in the Contractor's initial proposal, it seemed as though the Contractor had attempted to identify its actual pre-termination cost, but when it learned that its costs were considerably less than the payments it had already received, it change its theory of recovery, but it did not attempt to change its submitted cost information.

h) Based upon the above analysis, it is fairly clear that the estimated "Construction Phase" and "O & M Phase" amounts included in the TAR would generate the Government's maximum liability for the terminated contract. If the estimated amounts are over stated, then one of two actions could be taken; either 1) the depicted profit rate could remain the same which would reduce the amount of the Government's liability, or 2) the total pre-termination amount could remain the same which would increase the profit rate – as depicted in the following hypothetical example where the Construction Phase amount has been reduced by an arbitrary $1,000,000:

| Impact of $1,000,000 Cost Reduction | | Cost Analysis Amount | | Same Profit Rate | | Increased Profit Rate |
|---|---|---|---|---|---|---|
| Total Estimated Incurred Cost | | | | | | |
| Construction Phase | | $20,206,215 | | $19,206,215 | | $19,206,215 |
| O & M Phase | | $22,714,888 | | $22,714,888 | | $22,714,888 |
| Subtotal = | | $42,921,103 | | $41,921,103 | | $41,921,103 |
| Profit (or Fee) | 8.06% | $3,458,621 | 8.06% | $3,378,040 | 10.64% | $4,458,621 |
| Total = | | $46,379,724 | | $45,299,143 | | $46,379,724 |
| Total Post-Termination Cost | | | | | | |
| Termination Expenses | | $256,534 | | $256,534 | | $256,534 |
| Termination Settlement Cost | | $132,994 | | $132,994 | | $132,994 |
| Total = | | $389,528 | | $389,528 | | $389,528 |
| Final Contract Amount | | | | | | |
| Incurred Cost plus Fee | | $46,379,724 | | $45,299,143 | | $46,379,724 |
| Post Termination Cost | | $389,528 | | $389,528 | | $389,528 |
| Final Contract Amount = | | $46,769,252 | | $45,688,671 | | $46,769,252 |
| Amount Owed Contractor | | | | | | |
| Final Contract Amount | | $46,769,252 | | $45,688,671 | | $46,769,252 |
| less Pre-Termination Payments | | ($46,379,724) | | ($46,379,724) | | ($46,379,724) |
| less Post-Termination Payments | | ($1,072,668) | | ($1,072,668) | | ($1,072,668) |
| Additional Amount Owed Contractor = | | ($683,140) | | ($1,763,721) | | ($683,140) |

8) Profit Analysis:

a) Use of the alternate structured approach contained in EFARS 15.404 resulted in estimating a profit rate factor of 8.075 percent as set forth below:

| Factor | Rate | 0.03 - 0.12 Weight | Value |
|---|---|---|---|
| 1. Degree of Risk | 20 | 0.120 | 2.400 |
| 2. Relative Difficulty of Work | 15 | 0.050 | 0.750 |
| 3. Size of Job | 15 | 0.030 | 0.450 |
| 4. Period of Performance | 15 | 0.120 | 1.800 |
| 5. Contractor's Investment | 5 | 0.120 | 0.600 |
| 6. Assistance by Government | 5 | 0.075 | 0.375 |
| 7. Subcontracting | 25 | 0.068 | 1.700 |
| | 100 | | ======== |
| | Profit | Factor: | 8.075 |

REASONS FOR WEIGHTS ASSIGNED

1. High Risk Involved in Contract
2. Contract Involved Fairly Simple Work
3. Contract Exceeded $10,000,000
4. Contract Duration Exceeded 24 Months
5. Contractor's Investment was Above Average
6. Government Assistance was Slightly Above Average
7. 50% to 60% of the Work was Subcontracted

b) As reflected above, using the alternate structured approach resulted in estimating a profit rate factor of 8.075 percent which compares favorable with the 8.060 percent generated as the difference between the estimated pre-termination cost and the pre-termination payments contained in the Technical Analysis. This rate would be applied to the Contractor's pre-termination cost but not to the Contractor's post-termination cost.

c) The Contractor's 20 December 2005 submission contains profit based upon a rate of 16.3 percent applied to post-termination cost. In accordance with FAR 49.202, the TCO shall allow profit on preparations made and work done by the Contractor for the terminated portion of the contract but not on the settlement expenses...anticipatory profits and consequential damages shall not be allowed...profit shall not be allowed the contractor for material or services that, as of the effective date of termination, have not been delivered...regardless of the percentage of completion.

d) In accordance with FAR 49.201, the termination settlement should compensate the contractor fairly for the work done and the preparations made for the terminated portions of the contract, including a reasonable allowance for profit. However, FAR 49.203 states that in the negotiation or determination of any settlement, the TCO shall not allow profit if it appears that the contractor would have incurred a loss had the entire contract been completed. To date, the Contractor has not demonstrated that it was in a profit position when the contract was terminated; and the TCO only has the results of the TAR to indicate that the Contractor might be entitled to profit on the Contractor estimated pre-termination cost.

9) Price Analysis:

a) Performing a Price Analysis on this contract action is rather meaningless since the Contractor has not provided what it expects to be the final contract price, and review of both the Contractor's 20 June 2005 initial proposal and the 20 December 2005 submission does not provide any real assistance in this regard.

b) In the Contractor's 20 June 2005 proposal seeking $9,764,061, the Contractor did not specify whether this requested amount was in addition to the $46,379,724 it had been paid for its pre-termination work; or if the proposed amount was expected in addition to the $47,452,392 it had been paid through the date of its proposal.

c) Similarly, in the Contractor's 20 December 2005 submission seeking $7,641,772, the Contractor did not specify whether this amount was in addition to the $46,379,724 it had been paid for its pre-termination work; or if the proposed amount was expected in addition to the $47,452,392 it had already been paid as a result of the partial termination payments.

d) Assuming that the Contractor intended the $7,641,772 to be in addition to the $46,379,724 it had received for its pre-termination work, the Contractor's proposal would reflect a final contract price of $54,021,496; where the Cost Analysis amount discussed above reflects a final contract price of $46,769,252. Based upon these two amounts, the Contractor's proposal exceeds the Cost Analysis amount by $7,252,244 or 16 percent.

10) Significant Issues:

a) Cost or Pricing Data: The absence of the Contractor's Cost or Pricing Data (especially the Contractor's actual incurred pre-termination cost will have a significant impact on the TCO's ability to determine an equitable contract amount resulting from the termination. Although the Contractor was repeatedly requested to provide its Cost or Pricing Data, the Contractor has not provided its Cost or Pricing Data (so far it has only provided some information other than Cost or Pricing Data). During the negotiations, another attempt must be made to have the Contractor specifically identify its actual pre-termination cost. Caution should be exercised however, since if the Contractor does finally agree to provide something, the Contractor will most like want to consume countless hours attempting to create something (on a cost-reimbursable basis) instead of simply providing an amount that should be readily available from its accounting records. It may be in the best interest of the Government to make a unilateral termination settlement and then let the Contractor support it appeal with its Cost or Pricing Data.

b) Commercial Contract "Breach of Contract Claim": It is rather obvious that when the Contractor was informed that it needed to quantify its actual pre-termination cost that it abruptly moved away from its pre-termination cost - and attempted to convert its proposal into a commercial contract breach of contract claim. The Government negotiators will need to be prepared to explain to the Contractor (a lawyer) and the Contractor's lawyer why the remedy available under commercial contracts is not available under Federal Government contract. Again caution should be exercised and the parties reminded that the issue to be negotiated is not the type of remedy available to the Contractor, but rather the equitable contract amount resulting from the termination of a Federal Government contract. The TCO should not expend much negotiation time arguing this issue with the Lawyers and should be prepared to issue a unilateral termination settlement so that the Contractor can file its appeal and let a Judge provide the education that the Contractor may be seeking.

c) Contractor's Overhead Rate: Although the DCAA did not question the Contractor's proposed overhead rate of 60 percent; and that percentage was used in the above described analysis; the undersigned does not believe that the rate accurately reflects the Contractor's overhead rate. As presented in the Contractor's proposal, the 60 percent is simply the portion of the Parent Organization's indirect cost that should be prorated to the one of the Subsidiary Organizations (i.e., 60 % of CEG's indirect cost is carried by Cegali and the other 40% is carried by CEPOLK). The undersigned expected the indirect costs included in the Contractor's calculation to be supportable by the Contractor's records, and did not expect to find any duplication between the different indirect cost pools (just as reported by the DCAA). However, since a Contractor's overhead rate is the ratio of the Contractor's indirect cost to its direct costs (and the Contractor has steadfastly refused to provide its direct cost), the Contractor's overhead rate simply can not be determined from the available indirect cost information – only that Cegali's indirect cost consists of whatever it incurs plus 60 percent of whatever indirect cost CEG incurs. Although this issue has not be resolved, the magnitude of this issue would seem to be rather insignificant - and could only be resolved if the Contractor disclosed its actual cost data.

d) Limit Government Liability: As presented and discussed in this document, the TAR, Audit Report, and Cost Analysis has established a maximum Government liability resulting from the termination. That maximum liability is less than the amount the Contractor has already been paid.

11) Price Objective:

a) The most immediate objective should be to limit the Government to any further liability, by issuing a termination settlement either bilateral or unilateral if necessary. Until a settlement amount has been established, the Contractor will be able to continue "charging" hours against the contract on a cost-reimbursable basis. However, if the settlement amount has to be established unilaterally, then any time the Contractor consumes preparing and/or prosecuting its claim/appeal could only be recovered if the Contractor substantially prevails on its claim and appeal. By established a realistic settlement amount, even based upon the scant information currently available to the TCO, the probability of the Contractor substantially prevailing is extremely remote.

b) As discussed above, the monthly payments that the Contractor received for its pre-termination work covered all of its pre-termination cost and allowed the Contractor to also recover approximately 8 percent profit on its pre-termination cost. The Government subsequently made partial termination payments totaling $1,072,668; however, the Contractor's allowable, allocable, and reasonable post-termination costs are only $389,528. Based upon these amounts, the final contract amount should be established at $46,769,252 and the Contractor needs to immediately repay the Government additional $683,140 that was inadvertently previously paid to the Contractor.

Prepared By:

Bruce W. Stevenson, P.E.
Civil Engineer/Contract Administrator