EXHIBIT 16

CEPOH-CT 24 Oct 06

PRICE NEGOTIATION MEMORANDUM (FAR 15.406-3)

SUBJECT: Contract No. DACA87-91-C-0019, Shared Energy Savings Program, Aliamanu Family Housing Area, Oahu Hawaii, Termination for Convenience of the Government –Aliamanu Conservation Partners L.P (ACP)

1. Purpose of Negotiations/Description of the Acquisition: To obtain a fair and reasonable modified contract price resulting from the termination for convenience of the subject contract issued on 12 Aug 04 with an effective date of 30 Sep 04. The modified contract amount will include compensation for all work performed under the contract, as well as all incurred allowable, allocable, and reasonable post-termination costs resulting from the termination.

2. Name, Position, and Organization of Persons Representing the Government and Contractor in the Negotiation:

Government:

a. Bruce Stevenson, Civil Engineer/Contract Administrator, Transatlantic Programs Center.
b. David Kam, Chief, Contracting Division, Termination Contracting Officer, Honolulu District.
c. Richard Totten, Deputy District Counsel, Honolulu District

Contractor:

a. Robert Freeman, President, CEG.
b. Timothy Power, Attorney, Consultant to CEG.

3. Date and Place of Negotiations: Telephonic negotiations with all participants identified above commenced at 0900 hours, Hawaiian Standard time on 3 Oct 06.

4. Record of Actual Negotiation:

a. David Kam, Termination Contracting Officer (TCO) initiated the negotiations (when all parties were connected telephonically) by confirming the identities of all participants listed in paragraph 2 above. The purpose of the negotiations was stated, which was to arrive at a negotiated bilateral equitable termination settlement amount. The TCO then provided an overview of the contract, the termination for convenience, and the proposals, as follows:

- On 11 February 1991 the contract was awarded to Co-Energy Group (CEG), a California Corporation that certified it was not a Small Business and its President was Mr. Robert Freeman.

- Approximately eighteen (18) months after award of the contract, on 3 September 1992, based upon the Contractor's written request, the contract was novated from CEG to Cegali, Inc. also a California Corporation, and wholly owned by CEG.

- Approximately three (3) years later, on 23 March 1995, based upon Cegali's written request, the contract was again novated from Cegali, Inc. to the Aliamanu Conversation Partners L.P. (ACP), a Limited Partnership established in Hawaii, with Cegali (California) being a General Partner of the Hawaii Partnership.

- By modification number P00212 dated 12 August 2004, the Termination Contracting Officer (TCO) notified ACP that the contract was being terminated for the convenience of the Government, effective as of 30 September 2004, and requested that ACP provide its termination settlement proposal within one year from the effective date of the termination.

- Subsequently, Mr. Freeman referring to the required settlement proposal forms identified in FAR Part 49.602 and 49.206-1; indicated that the forms did not appear to be appropriate for this particular contract, and requested that the TCO waive the requirement for these forms. The TCO informed Mr. Freeman that it was more important for the Contractor to provide complete, current and accurate information, so that a termination settlement amount could be established, than using any particular termination settlement form.

- By letter dated 20 June 2005, Cegali (a Nevada Corporation) submitted what it called its "Costing Methodology For The Termination Of The Aliamanu Contract" and provided a proposal in the amount of $9,764,061.

- The TCO notified ACP that the submitted termination settlement proposal had not been prepared in accordance with FAR Table 15-2, and that the proposal did not appear to contain ACP's Cost or Pricing Data (all relevant facts). By letter dated 5 July 2005, Mr. Freeman certified that the termination settlement proposal had been prepared from the books, accounts, and records of the Contractor in accordance with recognized commercial accounting practices and Mr. Freeman provided a signed "Certificate of Current Cost or Pricing Data."

- The TCO reiterated to Mr. Freeman that the Contractor needed to submit a termination settlement proposal complying with the requirements of FAR Table 15-2 which involved the submission of the Contractor's Cost or Pricing Data.

- By letter dated 31 October 2005, Mr. Freeman submitted a revised termination settlement proposal in the amount of $7,641,772. The TCO again notified Mr. Freeman that the revised proposal still had not been prepared in accordance with the requirements set forth in FAR Table 15-2, and that the proposal still did not appear to contain ACP's Cost or Pricing Data (all relevant facts).

- On 20 December 2005 the TCO received a letter from the Law Offices of Timothy H. Power, which referred to Cegali's October Termination Settlement Proposal, and indicated that attached to the letter were "documents that support the cost and pricing data submitted with the proposal."

- Since the TCO had tried several times to have the Contractor submit its Cost or Pricing Data (which would have specifically identified the Contractor's actual cost incurred prior to the effective date of the termination), but was unsuccessful, the TCO suggested that the TCO review the Contractor's records to determine what facts the Contractor might have that could be submitted; Mr. Freeman agreed and indicated that the Contractor's records were at Co-Energy Group's office in Las Vegas, Nevada. As a result, the TCO visited Co-Energy Group's office in Las Vegas, Nevada (6 March 2006 through 10 March 2006) and reviewed all of the records made available at that location.

- During that visit, and as a result of the review of those records, the TCO orally requested that the Contractor provide specific information that appeared to be readily available to the Contractor. To date, the TCO has not received the requested "Information Other than Cost or Pricing Data."

b. Bruce Stevenson, Government Negotiator (GN) explained that the negotiations will be conducted in accordance with the requirements set forth in FAR -- Part 49 Termination of Contracts. The GN explained that there are two definitions in FAR 49.001 – Definitions, that were particularly relevant to these negotiations:

1). "Settlement agreement" means a written agreement in the form of a contract modification settling all or a severable portion of a settlement proposal.

2) "Settlement proposal" means a proposal for effecting settlement of a contract terminated in whole or in part, submitted by a contractor or subcontractor in the form, and supported by the data, required by this part. A settlement proposal is included within the generic meaning of the word "claim" under false claims acts (see 18 U.S.C. 287 and 31 U.S.C. 3729).

c. The GN explained that the regulations provide for different means of settling a contract terminated for the convenience of the Government under FAR 49.103 -- Methods of Settlement. Settlement of contracts terminated contracts terminated for convenience may be effected by: 1) a negotiated agreement; or 2) a determination by the TCO; or 3) a combination of these methods. When possible, the TCO should negotiate a fair and prompt settlement with the contractor. The TCO shall settle a settlement proposal by determination only when it cannot be settled by agreement.

d. The GN explained that the responsibilities of the Contractor associated with a terminated contract are set forth under FAR 49.104 -- Duties of Prime Contractor After Receipt of Notice of Termination. Particularly relevant to these negotiations is subparagraph h which reads - (h) Promptly submit the contractor's own settlement

proposal, supported by appropriate schedules. Based upon the termination settlement proposal received by the TCO, including the additional information submitted on 20 December 2005; the absolute worst thing that the TCO could do to the Contractor would be to accept the termination settlement proposal amount of $7,641,772 without any discussion; since if it was accepted, and the $47,452,392 that had already been paid to the Contractor was subtracted from the proposed contract amount, then the TCO would also need to demand that the Contractor return the overpayment amount of $39,810,620. A termination settlement proposal for this contract should have been submitted according to FAR 49.206-2 -- Bases for Settlement Proposals. This describes three different methods: (a) *Inventory basis, (* b) *Total cost basis; or* (c) *Other basis.* Settlement proposals may not be submitted on any basis other than paragraph (a) or (b) of this section without the prior approval of the chief of the contracting or contract administration office. Since the Contractor did not request, and the TCO did not previously approve, any basis other that inventory or total cost; one of these two methods must be used. Although the inventory method is preferred, the use of this method is not practicable for this particular contract – therefore the total cost method must be used. Paragraph (b) *Total cost basis* States - .

> (1) When use of the inventory basis is not practicable or will unduly delay settlement, the total-cost basis (SF 1436) may be used if approved in advance by the TCO as in the following examples:
>
> > (i) If production has not commenced and the accumulated costs represent planning and preproduction or "get ready" expenses.
> >
> > (ii) If, under the contractor's accounting system, unit costs for work in process and finished products cannot readily be established.
> >
> > (iii) If the contract does not specify unit prices.
> >
> > (iv) If the termination is complete and involves a letter contract.
>
> (2) When the total-cost basis is used under a complete termination, the contractor must itemize costs incurred under the contract up to the effective date of termination. The costs of settlements with subcontractors and applicable settlement expenses must also be added. An allowance for profit (49.202) or adjustment for loss (49.203(c)) must be made. The contract price for all end items delivered or to be delivered and accepted must be deducted. All unliquidated advance and progress payments and disposal and other credits known when the proposal is submitted must also be deducted.
>
> (3) When the total-cost basis is used under a partial termination, the settlement proposal shall not be submitted until completion of the continued portion of the contract. The settlement proposal must be prepared as in subparagraph (b)(2) of this section, except that all costs incurred to the date of completion of the continued portion of the contract must be included.

(4) If a construction contract or a lump-sum professional services contract is completely terminated, the contractor shall--

(i) Use the total cost basis of settlement;

(ii) Omit Line 10 "Deduct-Finished Product Invoiced or to be Invoiced" from Section II of SF 1436 Settlement Proposal (Total Cost Basis); and

(iii) Reduce the gross amount of the settlement by the total of all progress and other payments.

Furthermore, the GN explained that under FAR 49.206-1 -- Submission of Settlement Proposals, paragraph (c) states:

c) Settlement proposals must be on the forms prescribed in 49.602 unless the forms are inadequate for a particular contract. Settlement proposals must be in reasonable detail supported by adequate accounting data. Actual, standard (appropriately adjusted), or average costs may be used in preparing settlement proposals if they are determined under generally recognized accounting principles consistently followed by the contractor. When actual, standard, or average costs are not reasonably available, estimated costs may be used if the method of arriving at the estimates is approved by the TCO. Contractors shall not be required to maintain unduly elaborate cost accounting systems merely because their contracts may subsequently be terminated.

e. The GN explained that based on the settlement proposals received, the Technical Analysis Report, the DCAA audit report, and a cost analysis, the Government arrived at a proposed settlement amount of ($6,221,395) that was overpaid to ACP and was due to the Government. Enclosure (1) is a breakdown of that amount, which was orally explained line by line by the GN. Mr. Freeman did not agree that the Construction Phase Cost was $14,318,422 or that the Cost of Facilities Capital was $762,536. He indicated that the principal and interest on the construction phase was $24.2 million. The TCO indicated that if the construction phase cost was $24.2 million, then the requisite cost or pricing data supporting those costs should have been included in ACP's settlement proposal. Mr. Freeman indicated that he made all his records fully available for the Government to review. Mr. Freeman indicated that the contract was a fixed price contract when it was terminated and asked what the fixed price contract amount was; neither the GN nor TCO responded to his question, since the fixed price contract amount is not truly fixed, because the fixed monthly payment would need to be adjusted by the consumer price index. The GN explained that when a contract is terminated, the contractor does not get the rest of the contract amount, as claimed in the proposal. Mr. Freeman indicated that the Government's proposed settlement amount was not acceptable and that negotiations were at an impasse. In an attempt to reach a negotiated settlement and to avoid litigation, the GN proposed an alternate settlement amount of ($683,140) that was overpaid to ACP and due to the Government. See Enclosure (2). The GN explained that the difference between the first and alternate settlement amount was in the calculation of the Cost of Facilities Capital, based on the GN's own calculation of the

interest amount on the equipment loan. Mr. Freeman did not accept the alternate settlement offer and indicated that the negotiations were at an impasse, since he expected to receive additional payments of approximately $6 million for the termination settlement. Mr. Freeman requested that the TCO issue its unilateral determination as soon as possible, so the matter could be taken to court. The GN explained that the TCO's unilateral determination would most likely reflect the Government's initial settlement offer of ($6,221,395) due the Government and would not be the alternate settlement offer of ($683,140) due the Government. The GN cautioned Mr. Freeman that the alternate settlement offer had only been made by the GN in an attempt to arrive at a bilateral settlement agreement during negotiations. Mr. Freeman indicated that he understood, and reiterated that none of the GN's proposed settlement offers were acceptable.

5. Summary: Negotiations did not result in a negotiated bilateral equitable termination settlement amount. As requested by Mr. Freeman, the TCO will prepare its unilateral determination on the settlement amount.

Enclosures

DAVID Y. KAM
Chief, Contracting Division
Termination Contracting Officer

| | | | Amount | Reference |
|---|---|---|---|---|
| **Pre-Termination Cost** | | | | |
| | Construction Phase Cost | | $14,318,422 | From Contractor Certified Amoun |
| | Cost of Facilities Capital | | $762,536 | COFC From First Proposal |
| | O&M Phase Cost | | $22,714,888 | From Contractor Certified Informa |
| | | Subtotal = | $37,795,846 | |
| | (Assume Profit Position) | | | |
| | Profit | 8.06% | $3,045,623 | Calculated using OCE Weighted ( |
| | | Subtotal = | $40,841,469 | |
| **Post Termination Cost** | | | | |
| | Termination Expenses | | $256,534 | Cost Analysis |
| | Settlement Cost | | $132,994 | Cost Analysis |
| | | Subtotal = | $389,528 | |
| **Final Contract Amount** | | | | |
| | Pre-Termination Cost | | $40,841,469 | |
| | Post Termination Cost | | $389,528 | |
| | | Total = | $41,230,997 | |
| **Previous Payments** | | | | |
| | Pre-Termination Payments | | $46,379,724 | Certified Payment Records |
| | Partial Termination Payments | | $1,072,668 | Certified Payment Records |
| | | Total = | $47,452,392 | Certified Payment Records |
| **Amount Owed to Contractor** or (Owed by Contractor) | | | | |
| | Final Contract Amount | | $41,230,997 | |
| | Previous Payments | | ($47,452,392) | |
| | | Total = | ($6,221,395) | |

Enclosure (1)

| | | | Amount | Reference |
|---|---|---|---|---|
| **Pre-Termination Cost** | Construction Phase Cost | | $14,318,422 | From Contractor Certified Amoun |
| | Cost of Facilities Capital | | $5,887,793 | From Loan Amount or Technical / |
| | O&M Phase Cost | | $22,714,888 | From Contractor Certified Informa |
| | Subtotal = | | $42,921,103 | |
| | (Assume Profit Position) | | | |
| | Profit | 8.06% | $3,458,621 | Calculated using OCE Weighted ( |
| | Subtotal = | | $46,379,724 | |
| **Post Termination Cost** | Termination Expenses | | $256,534 | Cost Analysis |
| | Settlement Cost | | $132,994 | Cost Analysis |
| | Subtotal = | | $389,528 | |
| **Final Contract Amount** | Pre-Termination Cost | | $46,379,724 | |
| | Post Termination Cost | | $389,528 | |
| | Total = | | $46,769,252 | |
| **Previous Payments** | Pre-Termination Payments | | $46,379,724 | Certified Payment Records |
| | Partial Termination Payments | | $1,072,668 | Certified Payment Records |
| | Total = | | $47,452,392 | Certified Payment Records |
| **Amount Owed to Contractor** or (Owed by Contractor) | Final Contract Amount | | $46,769,252 | |
| | Previous Payments | | ($47,452,392) | |
| | Total = | | ($683,140) | |

Enclosure (2)